IN THE SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Supreme Court |
| | ) | No. CR-99-0378-AP |
| Appellee, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Pima County |
| | ) | Superior Court |
| LEMUEL PRION, | ) | No. CR-60263 |
| | ) | |
| Appellant. | ) | |
| | ) | |
| _____ ) | | **O P I N I O N** |


Appeal from the Superior Court of Pima County
Honorable Bernardo P. Velasco, Judge

**VACATED AND REMANDED**

_____


Janet Napolitano, Attorney General                           Phoenix
      by Kent E. Cattani, Chief Counsel
      Capital Litigation Section
and  Bruce M. Ferg, Assistant Attorney General
Attorneys for Appellee


Law Offices of the Pima County Public Defender               Tucson
      by Frank P. Leto, Assistant Public Defender
and  Brian X. Metcalf, Assistant Public Defender
Attorneys for Appellant

_____

**J O N E S, Chief Justice**

¶1      Lemuel Prion was convicted by a jury January 28, 1999, of first degree murder, kidnaping (dangerous), and aggravated assault (dangerous).  The murder of Diana Vicari occurred between October 22 and October 24, 1992.  The kidnaping and aggravated assault of Tabitha Armenta occurred at the end of 1992.  Prion was acquitted of a sexual assault charge as to Tabitha Armenta.  He was sentenced to death for the Vicari murder and to 21 years for the Armenta kidnaping, with a consecutive 15-year sentence for the aggravated assault.  Appeal directly to this court is mandatory when the trial court imposes a sentence of death.  Arizona Revised Statutes (A.R.S.) § 13-703.01 (2001).  We have jurisdiction pursuant to article VI, § 5(3) of the Arizona Constitution, A.R.S. § 13-4031, and Arizona Rules of Criminal Procedure 26.15 and 31.2(b).

## Facts

### *The Murder*

¶2      Diana Vicari was at the Tucson Community Center at about midnight Thursday, October 22, 1992.  Her car was found near La Osa Street the following Monday.  There had been a party in that area the previous Thursday night.  Vicari's car had been parked there since early Friday morning.  On Saturday, October 24, 1992, her severed arms were found wrapped in plastic bags in a dumpster.  Evidence indicated the arms had been severed from the body after death. The medical examiner testified that in her opinion two

-2-

different instruments were used to sever the arms. She referenced the probability of a heavy knife for the bones and a sharp serrated knife for the flesh. There was no physical evidence identifying Prion as her killer.

¶3     In August 1993, the police showed photographs of Vicari and Prion to Troy Olson, an employee of the New Orleans nightclub/bar in Tucson. According to the police, at that time Olson recognized Vicari but not Prion. About seventeen months later, in January 1995, Olson saw photographs of Vicari and Prion on the front cover of the *Tucson Weekly*. Olson contacted the police and then made a positive identification of Prion as the man who was with Vicari in the New Orleans the night of October 22, 1992.

¶4     Olson testified at trial that Vicari introduced Prion to him. Vicari's intent, according to Olson, was to attend a party later that evening. She asked Olson to meet her at the party. Vicari was to obtain the address of the party from Prion, return to the New Orleans, and leave the address for Olson. She did not return to the bar.

¶5     In addition to Olson's identification, the state provided evidence of the following facts: Prion was working two jobs at the time of the murder. He worked as a carpenter on weekdays and as a nursing home assistant on the weekend shift for The Golden Years Nursing Home. In December 1992, Prion told his nursing home

employer that he was afraid he was going to kill someone. In addition, he also owned several knives, including a machete, and had been to a recording studio located near the dumpster where the arms were discovered.

¶6    Prion also had a habit of talking about committing violent acts on women. He often spoke of being ripped off by women. He told his brother and sister-in-law about having threatened or having thought about threatening a woman with a machete, but ultimately coming to his senses and releasing her. Prion made similar statements to former cellmates Jeffrey Brown and Jerry Wilson.

¶7    Prion spoke to the Tucson police in September 1993 but never admitted the Vicari murder. Prion's comment upon seeing a photograph of Vicari was, "I want to say the face looks familiar, but the tits don't. And I remember tits like that." Detective Salgado thought this comment was odd as that particular photograph in his opinion shed little or no light on the accuracy of Prion's observation. Vicari's mother testified that her daughter was full chested.

***The Kidnaping and Aggravated Assault***

¶8    In 1992, Tabitha Armenta had been a street prostitute in Tucson with a drug problem. Armenta would normally let men pick her up, would not go through with the transaction, would take their money and run, or would sell them drugs.

¶9     Prion told Detective Salgado about being ripped off by a prostitute named Tabitha when he was interviewed regarding the Vicari murder. Prion stated that he made a false 911 overdose call, citing Tabitha's residence after she ripped him off several times. Based on this information, the Tucson police contacted Tabitha Armenta in prison in 1994. When police officers first showed her a photograph of Prion, Armenta did not recognize him.

¶10     After speaking with the police, Armenta wrote a letter to them, providing more details of the attack. She described an incident in which her attacker spoke of being ripped off. He told her he would cut her up and leave her or scatter her body. The attacker forced her to perform oral sex on him. He threatened her with a large knife and rubbed it on her body, saying that he enjoyed threatening women and that it excited him. Armenta eventually became angry and told her attacker that he should either just do it or let her go. He let her go.

### Trial Issues

#### *Olson's Identification*

¶11     Prion moved to suppress Olson's pretrial identification as unduly suggestive, unreliable, and in violation of his constitutional rights. Prion claimed that photographs viewed by Olson were suggestive because each was a single photograph, and they listed the defendant's name and the fact that he was incarcerated. The trial court noted the weakness of the

identification but nevertheless allowed it into evidence.[1]

¶12     At trial, Olson identified Prion as the man he saw with Vicari on the night she disappeared.  Olson had seen photographs of Prion on two earlier occasions.  The first was August 1993 when the police showed Olson a mug shot of Prion.  At that time, Olson could not identify Prion.  He stated that the person in the photograph did not look familiar.

¶13     The second occasion occurred when Olson saw separate photographs of both the defendant and Vicari on the cover of the January 1995 *Tucson Weekly*.  Prion's photograph supplied his name and date of birth and indicated that he was incarcerated.  Moreover, the *Weekly* labeled Prion as the prime suspect in the Vicari murder.  After viewing this photograph, Olson identified Prion as the man who was with Vicari on the night she disappeared.

¶14     We review orders regarding motions to suppress on an abuse of discretion standard.  *State v. Atwood*, 171 Ariz. 576, 603, 832 P.2d 593, 620 (1993).  Pretrial identifications which are fundamentally unfair implicate the due process clause of the Fourteenth Amendment.  *State v. Nordstrom*, 200 Ariz. 229, 241, 25 P.3d 717, 729 ¶23 (2001) (citing *Stovall v. Denno*, 388 U.S. 293, 297-98 (1967)); *see also Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).  To show a due process violation, the defendant must prove

---

[1] Minute entry dated December 22, 1998.

that the circumstances surrounding the pretrial identification created a substantial likelihood of irreparable misidentification and that the state was responsible for that suggestive pretrial identification. *State v. Williams*, 166 Ariz. 132, 135-39, 800 P.2d 1240, 1243-47 (1987).

¶15    There is no need to perform a *Biggers* analysis when the identification is not the result of state action. *Nordstrom,* 200 Ariz. at 241, 25 P.3d at 729 ¶24 ("Because the state action requirement of the Fourteenth Amendment . . . cannot be established, due process is inapposite.") (citation omitted). We find no state action here which resulted in the identification. The article and photograph were published by the *Tucson Weekly*. The article was written by a freelance writer not employed by the Tucson Police Department. While the writer had some contact with the police and misrepresented herself to others as having the approval of the police, we agree with the trial court that she "was not an agent of the Tucson Police Department nor the Pima County Attorney . . . and had no direct contact or cooperation from Det. Salgado."

¶16    As this court noted in *Nordstrom*, due process concerns may be implicated where a minimal threshold of reliability is not met. *Nordstrom,* 200 Ariz. at 241, 25 P.3d at 729 ¶26. While Olson's identification of Prion was weak, we believe the state demonstrated at least the threshold standard of reliability set

forth in *Williams*, 166 Ariz. at 137, 800 P.2d at 1245.

**¶17**     Defense counsel thoroughly cross examined Olson regarding his identification.  Prion presented the testimony of another bar employee to discredit Olson.  He also presented testimony from a psychologist regarding problems inherent in eyewitness identification.  The jury heard that Olson could not identify Prion from the photograph shown him by the police in August 1993.

**¶18**     Any complaints concerning the identification go to its weight and credibility, not its admissibility.  Such matters are of course for the jury to consider.  *Nordstrom,* 200 Ariz. at 242, 25 P.3d at 730 ¶27.  In our view, the trial court did not abuse its discretion in admitting Olson's identification of Prion.

### Third party culpability evidence

**¶19**     The state repeatedly argued at trial that the inherent tendency test from *State v. Fulminante* required a connection between the third party and the crime and that vague suspicions were insufficient.  *State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988) ("Before a defendant may introduce . . . [third party culpability evidence] the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime.").  The state maintained the same argument on appeal.

**¶20**     The trial judge precluded third party culpability evidence regarding one John Mazure, relying on the inherent

connection language in *Fulminante*. The judge did agree to admit evidence relating to Robert Encillas and Greg Hatton, evidence which the defense ultimately declined to use.

**¶21** The admissibility of third party culpability evidence is reviewed under an abuse of discretion standard. *State v. Tankersley*, 191 Ariz. 359, 369, 956 P.2d 486, 496 ¶37 (1998). It is permissible for a defendant to attempt to show that another person committed the crime for which he is charged, *Tankersley,* 191 Ariz. at 369, 956 P.2d at 496 ¶38 (citations omitted), but it remains in the trial court's discretion to exclude the evidence if it offers only a possible ground of suspicion against another. *State v. Oliver*, 169 Ariz. 589, 591, 821 P.2d 250, 252 (App. 1991).

**¶22** In our recent opinion in *State v. Gibson*, 202 Ariz. 321, 44 P.3d 1001 (2002), we clarified the rule, holding that a special, higher standard of admissibility for third party culpability evidence was not the intention of *Fulminante.* The proper standard regarding third party culpability evidence is found in Rules 401, 402, and 403 of the Arizona Rules of Evidence. Any such evidence must simply be relevant and then subjected to the normal 403 weighing analysis between relevance, on the one hand, and prejudice or confusion on the other. *Gibson,* 202 Ariz. at 323, 44 P.3d at 1003 ¶13.

**¶23** The defense offered the following evidence regarding Mazure: he was a co-worker of Vicari's at Eegees, a restaurant in

Tucson; he was disciplined for sexually harassing female co-workers on the job; he tried to conceal his discipline from the police; he attempted to rape one of his female co-workers at his apartment after work; he had a violent temper and bit a woman's nose during a fight; he rented a new apartment on the day of Vicari's disappearance; that new apartment was close to both the New Orleans nightclub and the location at which Vicari's car was found; he was working at the New Orleans on the night Vicari disappeared; he denied that fact when questioned by the police; one of the doormen at the New Orleans said Vicari was let in to the bar that night specifically to see him; and finally, he appeared at work the next morning after Vicari's disappearance so disheveled and disoriented that he was fired. He was also considered a suspect early in the investigation, at least to the extent that his car was tested by the police for the presence of blood.

¶24    We explained in *Gibson* that the "proper focus in determining relevancy is the effect the evidence has upon the *defendant's* culpability. To be relevant, the evidence need only *tend* to create a reasonable doubt as to the defendant's guilt." *Gibson*, 202 Ariz. at 324, 44 P.3d at 1004 ¶16 (emphasis in original).

¶25    The proffered Mazure evidence is relevant in Prion's trial because on its face it may suggest reasonable doubt as to Prion's guilt. It supports the notion that Mazure had the

opportunity and motive to commit this crime and that he may have been in contact with Vicari.

¶26    While some confusion could occur with admission of the Mazure evidence, its probative value is clear, and it is not substantially outweighed by the possibility of prejudice.  We therefore conclude the trial court abused its discretion by excluding the evidence of Mazure's activity and behavior.

¶27    For an error to be reversible, it must be clearly prejudicial and "sufficient to create a reasonable doubt about whether the verdict might have been different had the error not been committed."  *State v. Pandeli*, 200 Ariz. 365, 372, 26 P.3d 1136, 1143 ¶18 (2001) (citations omitted).  Given the relative strength of the Mazure evidence, we cannot say that the result of this trial would have been the same if the evidence had been admitted.  The error necessitates a new trial on the Vicari murder charge.

### *Joinder of Armenta and Vicari counts*

¶28    The defendant filed a motion to sever the Armenta counts from the Vicari murder charge.  After hearing argument, Judge Velasco issued a minute entry denying the defense motion to sever, with no explanation.  On the record, the trial judge stated that his decision was based on motive.  The motion was re-stated based on the weakness of Armenta's identification of her attacker.  The state argued that there was other evidence of identity.  At that

-11-

point, the trial judge once again denied the motion to sever.  A denial of severance is reviewed for abuse of discretion.  *State v. Murray*, 184 Ariz. 9, 25, 906 P.2d 542, 558 (1995).

**A. Rule 13.3(a)**

¶29      It is unclear from the record which subsection of Rule 13.3(a)[2] of our Rules of Criminal Procedure formed the basis for the trial judge's determination allowing consolidation of the Vicari murder with the Armenta kidnaping and aggravated assault. Ariz. R. Crim. P. 13.3(a).  We will briefly discuss each of the subsections.

¶30      Cases joined under Rule 13.3(a)(1) must be severed upon request unless the evidence on the joined count would be admissible in a separate trial on the other count.  Ariz. R. Crim. P. 13.4(b). In other words, since the defendant requested severance, subsection (a)(1) could not support consolidation unless the trial judge believed the evidence was cross-admissible.[3]

¶31      As to Rule 13.3(a)(2), the state now concedes that the

---

[2] Two or more offenses may be joined if they:
(1) [a]re of the same or similar character; or
(2) [a]re based on the same conduct or are otherwise connected together in their commission; or
(3) [a]re alleged to have been a part of a common scheme or plan.
Ariz. R. Crim. P. 13.3(a).

[3] We discuss the admissibility of the Armenta crimes as evidence of other acts under Rule 404(b) later in part B of this section.  Ariz. R. Evid. 404(b).

Vicari murder and the Armenta crimes did not involve the "same conduct." Further, although the prosecutor argued for joinder under 13.3(a)(3) at trial, the state acknowledges on appeal that under our current *Ives* standard, such joinder would not be appropriate. *State v. Ives*, 187 Ariz. 102, 106-08, 927 P.2d 762, 766-68 (1996). This means the only unanswered question is whether the Vicari and Armenta offenses were "otherwise connected together in their commission" under Rule 13.3(a)(2).

¶32      The "otherwise connected together in their commission" language addresses whether evidence of the two crimes was so intertwined and related that much the same evidence was relevant to and would prove both, and the crimes themselves arose out of a series of connected acts. *See State v. Williams*, 183 Ariz. 368, 375-77, 904 P.2d 437, 444-46 (1995) (murder of first victim consolidated with armed robbery and attempted murder of second victim where attempted murder occurred after the murder, and by the defendant's own statements was to silence a witness who he believed had implicated him in the first murder); *State v. Comer*, 165 Ariz. 413, 418-20, 799 P.2d 333, 338-40 (1990) (murder and armed robbery of one victim consolidated under Rule 13.3(a)(2) and (3) with series of crimes perpetrated on victims two and three where temporal proximity existed between the two sets of crimes and they were a series of events connected by the common purpose of obtaining money and supplies); *State v. Martinez-Villareal*, 145

Ariz. 441, 446-47, 702 P.2d 670, 675-76 (1985) (two murder charges properly joined with burglary charge where the murder weapons came from the burglary).

¶33     The crimes against the two victims here were not intertwined.  The Vicari murder and the Armenta kidnaping and assault were not provable by most of the same evidence, and they did not arise out of a series of connected acts.  As far as we can discern from this record, the criminal acts against Vicari were quite distinct from those against Armenta.

¶34     In addition, in *Ives* we clarified that the term "common scheme or plan" was to be interpreted narrowly so as to define the distinction between "same or similar character" and "common scheme or plan."  *Ives*, 187 Ariz. at 107-08, 927 P.2d at 767-68 ("We adopt this narrower definition because any other result blends Rule 13.3(a)(1) . . . and Rule 13.3(a)(3) . . . beyond recognition.  If common scheme is merely a 'visual connection' manifested by 'similarities where one would expect differences,' Rule 13.3(a)(3) becomes a detour around defendant's right to sever offenses joined because they are similar.").

¶35     Likewise, Rule 13.3(a)(2) should be interpreted narrowly. We reject the state's suggestion that Rule 13.3(a)(2) is a catch-all for cases in which some logical connection exists between unrelated crimes.  Viewing "otherwise connected together in their commission" as a catch-all would similarly make Rule 13.3(a)(2) "a

-14-

detour around defendant's right to sever offenses joined because they are similar." *Id.*

¶36     Under the foregoing standard, we find the trial judge's decision to deny severance an abuse of discretion.

## B. Admissibility of Other Acts Under Rule 404

¶37     The trial judge noted identity and motive stemming from the evidence of other acts as his reasons for allowing consolidation.  Other acts evidence must be evaluated under Rule 404(b) of the Rules of Evidence.[4]  For other act evidence to be admissible, it must be shown by the clear and convincing standard that the act was committed and that the defendant committed it. *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997).

¶38     The identity exception to Rule 404 is applicable only where "the pattern and characteristics of the crimes . . . are so unusual and distinctive as to be like a signature." *State v. Stuard*, 176 Ariz. 589, 597, 863 P.2d 881, 889 (1993) (citations omitted); *see also State v. Jackson*, 186 Ariz. 20, 27, 918 P.2d

---

[4]     Except as provided in Rule 404(c) evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ariz. R. Evid. 404(b).

-15-

1038, 1045 (1996) ("[T]he modus operandi of and the circumstances surrounding the two crimes must be sufficiently similar as to be like a signature.") (citations omitted).

¶39    Here, very little is known about what happened to the murder victim because her body has never been found.  She was a nineteen-year-old college student seen in a bar with the defendant.  Two days later her severed arms were discovered in a dumpster.  It is unknown if she was sexually assaulted prior to being murdered or what the cause or circumstance of death may have been.  Tabitha Armenta was a thirty-five-year-old street prostitute involved with drugs when she was detained by a man against her will, threatened with a knife, and ultimately released.  Her attacker threatened to cut her up and leave her or scatter her body.  He rubbed a knife on her body and told her that threatening women excited him.

¶40    In addition, there is insufficient evidence regarding the Vicari murder to conclude that the crimes against the two victims were so "unusual and distinctive as to be like a signature." *Stuard*, 176 Ariz. at 597, 863 P.2d at 889 (citations omitted).  There is no evidence in this record to indicate that Vicari was sexually assaulted or that her attacker was sexually gratified by threatening women.  We know neither the extent to which Vicari was injured prior to her death nor the cause of death.  We do know that she was not released unharmed.

¶41    Any connection between the two crimes is attenuated at

best.  The most that can be said is that each occurred in Tucson at the end of 1992, each involved a female victim, and a knife or knives were utilized by the perpetrator(s) at some point during commission of the crimes.  These few factors are insufficient to suggest a signature crime.  Arizona law requires a more clear connection to support a Rule 404 exception based on identity.[5]

¶**42**    Motive, also indicated by the trial judge, is another exception to the general rule that other act evidence is generally inadmissible.  Ariz. R. Evid. 404(b).  The state argued that both the Vicari murder and the Armenta crimes were sexually motivated and involved the defendant's desire to terrorize, rape, kill, and dismember women.  The state cited the defendant's many statements to family members, cellmates, and others of having picked up women, having threatened them with a knife or machete, and having thought about killing the victims to support its sexual motivation theory. The prosecutor argued this connection in closing argument, saying Vicari was "probably also raped," both Armenta and Vicari were "brunette[s] with blue eyes," and defendant's fantasies about picking up a young girl and cutting her up is "exactly what happened to [Vicari]."

---

[5] Moreover, the trial judge suppressed Armenta's identification of the defendant as her attacker.  Given this, we question the state's ability to meet the required clear and convincing standard for other acts evidence.  *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997).

¶**43**       These are statements that essentially amount to aberrant

sexual propensity evidence under Evidence Rule 404(c) which cannot

be admitted, much less argued, without specific findings.[6]   The

defendant was not charged with a sexual offense regarding Vicari.

His general threats to do harm have little probative value when not

specifically directed at a particular victim.  *State v. Hughes*, 189

Ariz. 62, 71, 938 P.2d 457, 466 (1997);  *State v. Bible*, 175 Ariz.

549, 593, 858 P.2d 1152, 1196 (1993).  Without more, the state has

not satisfied the requisite burden by which to justify Rule 404(c)

findings.  Therefore, evidence introduced in support of the Armenta

counts should not have been admitted in the Vicari murder trial.

¶**44**       It is reasonably clear that the state's evidence in

support of the Armenta counts does no more than raise an inference

that the "defendant acted in conformity with a negative view of

women . . . [and] this type of evidence is prohibited by Rule

404(a)."  *Hughes*, 189 Ariz. at 71-72, 938 P.2d at 466-67.  Because

evidence of these separate crimes was not cross-admissible under

---

[6] The rule requires the trial court to find the following: sufficient proof that the defendant committed the prior act; the other act supports a reasonable inference that the defendant has a character trait giving rise to an aberrant sexual propensity to commit the crime charged; and that the other crime would be admissible under a Rule 403 weighing analysis (taking into consideration the remoteness of the prior act, the similarity of the prior act, the strength of evidence supporting the prior act, the frequency of the other acts, surrounding circumstances, relevant intervening events, other similarities or differences, and other relevant factors).  Ariz. R. Evid. 404(c).

Rule 404, and joinder was not permitted under Rule 13.3(a), severance of the counts relating to Vicari and Armenta was denied in error.[7]

### Conclusion

¶45    Reversible error occurred with the exclusion of the third party culpability evidence concerning John Mazure.  Further, the trial court committed prejudicial error in failing to sever the crimes against Armenta from the Vicari murder.

¶46    Prion's convictions and sentences are vacated on all counts and the case is remanded to the trial court for proceedings consistent with this opinion.

_____
Charles E. Jones
Chief Justice

CONCURRING:


_____
Ruth V. McGregor, Vice Chief Justice


_____
Stanley G. Feldman, Justice

---

[7] Additionally, the court notes that even if the evidence supporting both the Vicari and Armenta charges was cross-admissible, its highly prejudicial impact would substantially outweigh any probative value.  Ariz. R. Evid. 403.

_____
Thomas A. Zlaket, Justice (retired)


_____
Edward C. Voss, Chief Judge, Court
      Appeals, Division One


        NOTE:   Due to the vacancy on this court, the Honorable
        Edward C. Voss, Chief Judge of the Court of Appeals,
        Division One, was designated to participate in this case
        under article VI, § 3 of the Arizona Constitution.