NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

SHAUN ANDREW PETERSON, *Appellant.*

No. 1 CA-CR 15-0106
FILED 9-8-2016

Appeal from the Superior Court in Maricopa County
No. CR2013-000551-001 DT
The Honorable Margaret R. Mahoney, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By William Scott Simon
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mikel Steinfeld
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Andrew W. Gould and Judge Randall M. Howe joined.

_____

**C A T T A N I**, Judge:

¶1          Shaun Andrew Peterson appeals his convictions and sentences for five counts of sexual conduct with a minor and two counts of child molestation.  For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2          In 2007, Peterson moved in with the victim and the victim's mother ("Mother") and brother ("Brother").  The victim was in kindergarten at the time.  Mother had drug issues and she suffered from mental illness; as a result, Peterson became the children's primary caregiver.

¶3          On February 28, 2012, Peterson contacted the police to report that Mother had sexually abused the victim.  That afternoon, Phoenix Police Detective Leske met with Peterson and the victim at the Family Advocacy Center.  The victim reported a single act of sexual abuse, occurring in October 2011, from which she had sustained a vaginal injury and bled for three days.  After meeting with Peterson and the victim, Detective Leske went to the victim's residence and spoke with Mother, who denied injuring the victim.

¶4          Based on the reported injury, Detective Leske arranged for the victim to have a medical examination by a pediatrician at Phoenix Children's Hospital.  The doctor first spoke with Peterson, who accompanied the victim to the hospital and told the doctor that the victim had accused Mother of injuring her.  Upon examining the victim, the doctor observed a "healed complete tear in the hymen" that was indicative of penetrating trauma.

¶5          Soon thereafter, the victim, Brother, and Peterson moved in with the victim's maternal grandmother ("Grandmother").  Over the next ten days, Grandmother noticed that the victim would frequently lie on Peterson and that they would often text each other and then immediately

erase the texts. Grandmother relayed her concerns regarding these behaviors to a police detective and asked Peterson to move out of her home.

¶6 On March 22, 2012, after interviewing Grandmother and Brother, Detective Leske informed Mother that he was submitting the evidence from his investigation to the Maricopa County Attorney's Office to determine whether charges should be filed against her. At that point, Mother indicated that Peterson had recently acknowledged sexually abusing the victim. Based on this information, Detective Leske arranged for a "one-party consent call" in which Mother would confront Peterson with sexual abuse allegations.

¶7 During the confrontation call, Peterson admitted touching the victim's genitals, digitally penetrating the victim's vagina, and "almost daily" oral–vaginal contact with the victim. Immediately after the confrontation call, Detective Leske went to Mother's house, where he found Peterson. With Mother's consent, the detective searched the home and discovered that one of the bedroom mattresses had pieces cut out of it.

¶8 Detective Leske interviewed Peterson at the police station. After being advised of his *Miranda*[1] rights, Peterson told the detective that he was "going to take the blame for [Mother]." Detective Leske instructed Peterson to simply tell the truth, and Peterson said he would do so.

¶9 Peterson told Detective Leske that he first touched the victim's genitals when she was seven years old. Mother was at a hospice facility caring for her grandmother and was unaware that Peterson had touched the victim's genitalia while they were cuddling under a blanket on the couch. Peterson also admitted to having oral–vaginal contact and oral–penile contact with the victim, and to having the victim manually touch his genitals. Although Peterson claimed Mother was present during some of the acts, he described himself as the perpetrator. Consistent with the victim's description, Peterson also admitted to digitally penetrating the victim's vagina in a manner that caused injury and bleeding. Peterson stated that Mother was not present at that time. Peterson further informed Detective Leske that several acts occurred on a bed, and he had cut out portions of the mattress to remove stains. He likewise destroyed a secure digital card that contained incriminating evidence.

¶10 The victim subsequently submitted to a second forensic interview conducted by Wendy Dutton, a member of Phoenix Children's

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Hospital's Child Protection Team. The victim told Dutton that Peterson, not Mother, had sexually abused her.

¶11 Based on the victim's revised statements and Peterson's confession, he was charged with five counts of sexual conduct with a minor and two counts of child molestation.

¶12 At trial, the victim testified that after returning home from school one afternoon, she and Peterson were alone upstairs and Mother was outside. Peterson removed the victim's clothing and digitally penetrated her vagina, which caused pain and bleeding. The victim screamed, and Peterson covered her mouth with his other hand. The victim then bit Peterson's hand, ran to the bathroom, and locked the door. The victim also testified that Peterson repeatedly had oral contact with her genitals, including while waking her from sleep. He also repeatedly had her orally and manually touch his genitals.

¶13 Peterson testified, claiming that the victim told him that Mother had sexually abused her. Peterson stated that he confronted Mother with the accusation, then reported the abuse to the police. When asked why he confessed to numerous acts of sexual abuse in the confrontation call, Peterson explained that he "t[ook] the blame . . . to help throw off the detective." Peterson further stated that he was on numerous narcotic medications that impaired his thinking. When questioned about his explicit descriptions of various sex acts, both in the confrontation call and during his interview with Detective Leske, Peterson claimed he was simply recalling sex acts with Mother, not conduct with the victim. Peterson denied having any type of sexual contact with the victim. He maintained that he confessed to committing sexual abuse only "to confuse Detective Leske" and testified that he thought the allegations of sexual acts with the victim were "so outrageous" that no one would believe them. He likewise asserted that he cut out stains from the mattress "to throw Detective Leske off."

¶14 The jury convicted Peterson as charged, and the superior court sentenced him to four consecutive lifetime sentences for four of the counts of sexual conduct with a minor, to be followed by consecutive prison terms totaling 37 years on the remaining counts. Peterson timely appealed,

and we have jurisdiction under Arizona Revised Statutes ("A.R.S.") § 13-4033.[2]

## DISCUSSION

### I. Preclusion of Prior Inconsistent Statement.

¶15 Peterson contends the superior court erred by precluding evidence that Mother had committed an act of physical abuse against Brother. Peterson argues that the court's ruling prevented him from fully presenting his third-party defense and hindered his ability to refute the State's assertion that Mother had never physically harmed the children.

¶16 The victim testified that although she was afraid of Mother, Mother was never violent with her. Brother also testified that he was afraid of Mother because she yelled and threw things at him and the victim, but he also said Mother had never physically hurt him. Like the victim, Brother testified that he felt safer with Peterson than with Mother. The prosecutor, during closing argument, acknowledged that Mother had a volatile temperament, but argued that she had "never" physically harmed her children.

¶17 On cross-examination, defense counsel attempted to introduce into evidence a transcript of Brother's prior police interview in which he stated that Mother had extinguished a cigarette on his hand. Counsel asserted that the prior interview was relevant to impeach Brother's testimony that Mother never hurt him. The State objected, arguing that it related to an alleged prior bad act and was inadmissible under Arizona Rule of Evidence ("Rule") 404(b). The court found the evidence "to be clearly 404(b)." Defense counsel then sought to introduce the evidence for impeachment purposes as a prior inconsistent statement, and the State responded that the evidence was irrelevant, unduly prejudicial, and subject to exclusion under Rule 404(b). The State further argued that it was unclear from the interview transcript whether the cigarette burn was accidental or intentional, and thus the evidence was not clearly impeachment material. The superior court, "persuaded by all of the arguments the State ha[d] made," precluded the evidence. The court also noted that evidence Mother committed a single act of physical abuse did not increase the likelihood that she had committed multiple acts of sexual abuse, and therefore was of limited probative value.

---

[2]     Absent material revisions after the relevant date, we cite a statute's current version.

¶18 We review the admissibility of third-party culpability evidence for an abuse of discretion. *State v. Prion*, 203 Ariz. 157, 161, ¶ 21 (2002). We will affirm the superior court's admissibility ruling if the result is legally correct on any basis. *State v. Carlson*, 237 Ariz. 381, 387, ¶ 7 (2015). As argued by Peterson and acknowledged by the State, the admission of third-party culpability evidence is governed by Rules 401 through 403. *State v. Machado*, 226 Ariz. 281, 284, ¶ 16 (2011); *Prion*, 203 Ariz. at 161, ¶ 22. Accordingly, when evaluating the admissibility of third-party culpability evidence, the general rules of evidence apply and evidence "must simply be relevant and then subjected to the normal 403 weighing analysis between relevance, on the one hand, and prejudice or confusion on the other." *Prion*, 203 Ariz. at 161, ¶ 22.

¶19 Peterson contends that Brother's prior statement to police should have been admitted both substantively and for impeachment purposes. A witness's prior inconsistent statement is not hearsay and may be introduced as substantive evidence when the witness testifies at trial and is subject to cross-examination. Ariz. R. Evid. 801(d)(1)(A); *see also State v. Skinner*, 110 Ariz. 135, 142 (1973); *State v. Mills*, 196 Ariz. 269, 274, ¶ 21 (App. 1999) (explaining that a "jury may consider prior inconsistent statements as impeachment and as substantive evidence").

¶20 The State argues that Brother's trial testimony was not inconsistent with his statement during the police interview because his statement did not specify whether Mother put the cigarette out on his hand intentionally. But Brother was not asked at trial whether Mother had ever *intentionally* hurt him, but rather whether Mother had ever *physically* hurt him. Brother's repeated denial that Mother had ever caused him physical harm was thus inconsistent with his statement during the police interview that she had extinguished a cigarette on his hand. Accordingly, Brother's statement to police qualified as non-hearsay under Rule 801(d)(1)(A).

¶21 A prior inconsistent statement nevertheless may be precluded under Rule 403 if its relevance is outweighed by the risk that it is unduly prejudicial or confusing, or will mislead the jury. *See also State v. Allred*, 134 Ariz. 274, 277 (1982). Here, the superior court balanced the Rule 403 factors, and did not abuse its discretion by precluding the proffered evidence as tenuous, speculative, and of only marginal relevance. *See State v. Dann*, 205 Ariz. 557, 569, ¶ 36 (2003) (noting that a trial court need not allow "mere suspicion or speculation" regarding another's guilt, and that proffered third-party culpability evidence is irrelevant if it fails to create a reasonable doubt regarding the defendant's guilt or if it fails the Rule 403 test due to its "tenuous and speculative nature").

¶22 Moreover, any possible error from precluding the evidence of physical harm was harmless. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."). To evaluate the harm caused by improper denial of an impeachment opportunity, we consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

¶23 Applying these principles here, Brother's testimony was of minimal importance to the State's case, and Peterson was able to present his third-party defense without the physical harm evidence. First, Brother did not witness any acts of sexual abuse and was not told Peterson sexually abused the victim until after the victim's revised disclosures to the police. Thus, even if defense counsel had been permitted to use the prior inconsistent statement to undermine Brother's credibility and the weight accorded his testimony, it would not have called into question the strength of the State's case. Second, although defense counsel was unable to elicit any other evidence that Mother had engaged in an act of physical abuse, the record includes significant evidence that Mother was unstable and frightened the children, including by throwing things at them. Both Brother and the victim testified that they were fearful of Mother and felt much safer with Peterson. Third, other than this limitation, defense counsel was permitted considerable latitude in cross-examining Brother. Fourth, and most importantly, the evidence of Peterson's guilt was overwhelming. In both the confrontation call and in Peterson's police interview, he explicitly acknowledged numerous acts of sexual abuse. He also confessed to destroying physical evidence of the sexual abuse. Likewise, in her revised police statements and at trial, the victim identified Peterson as the perpetrator. Accordingly, any error relating to Brother's testimony was harmless.

¶24 Although the superior court precluded evidence of Brother's prior inconsistent statement, the prosecutor's argument that Mother never physically harmed her children was improper. The court's preclusion ruling was not based on a finding that the evidence was inaccurate, and the ruling did not justify an argument that the evidence did not exist. Nevertheless, error from the prosecutor's argument (which was not evidence), was similarly harmless given the overwhelming evidence of

Peterson's guilt and the limited relevance of information that Mother may have previously harmed Brother physically.

## II.    Denial of Motion for Mistrial.

**¶25**    Peterson contends the superior court erred by denying his motion for mistrial. Specifically, he asserts the court should have declared a mistrial after a witness referred to Mother's voice-stress test results that had been precluded by a previous court order.

**¶26**    We review the denial of a motion for mistrial for an abuse of discretion. *State v. Jones*, 197 Ariz. 290, 304, ¶ 32 (2000). In evaluating whether a mistrial is warranted, the superior court "is in the best position to determine whether the evidence will actually affect the outcome of the trial." *Id.* In *State v. Hallman*, 137 Ariz. 31, 37 (1983), the Arizona Supreme Court noted that, in making this determination, the court should consider "(1) whether the remarks called to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." Because a "declaration of a mistrial is the most dramatic remedy for trial error," it should be granted "only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262 (1983).

**¶27**    In the weeks leading up to trial, the parties stipulated that the results of Mother's voice-stress test were inadmissible, and the court precluded evidence of the test. At trial, however, Grandmother volunteered that she doubted Mother had committed sexual abuse because "she passed a lie detector test." Defense counsel objected and moved for a mistrial. The court denied the mistrial, but gave a curative instruction informing the jury that no lie-detector test had ever been administered to Mother and struck the portion of Grandmother's testimony referring to such a test:

> Ladies and gentlemen, you have just heard the witness mention a lie detector test. The parties stipulate there was no lie detector test given to [Mother]. You are further instructed that the Court is ordering striking from the record any testimony about a lie detector test. The jury is instructed to disregard that in its entirety, not consider it for any purpose.

**¶28**    During closing argument, defense counsel questioned the veracity of Grandmother's testimony by stating: "[Grandmother] testified that [Mother] took a lie detector [test], when everyone agrees that didn't

happen. [Grandmother] doesn't want to see her daughter get in trouble." After defense counsel finished his argument, the court again admonished the jurors that the testimony regarding a lie-detector test had been stricken from the record and ordered the portion of defense counsel's argument referring to a lie-detector test stricken as well.

**¶29** Applying the first prong of the *Hallman* test, Grandmother clearly testified about evidence that was inadmissible. As to the second prong, however, the superior court's curative instructions minimized the possibility that the improper evidence may have influenced the jury's verdicts. In fact, rather than simply striking Grandmother's testimony as improper, the court informed the jurors that Grandmother's testimony was incorrect. Thus, to the extent the jurors considered the stricken testimony, in contravention of the court's instruction, it was with the understanding that Grandmother was either ill-informed about the administration of a lie-detector test or she had lied about the existence of such a test. As shown by defense counsel's reference to the initial curative instruction in his closing argument, any lingering harm caused by Grandmother's errant testimony undermined her credibility and inured to Peterson's benefit. Accordingly, the superior court did not abuse its discretion by denying Peterson's motion for mistrial.

### III. Denial of Counseling Records and Testimony.

**¶30** Peterson argues the superior court impaired his constitutional right to confront a witness by denying his discovery request for the victim's counseling records and by limiting counsel's cross-examination of the victim regarding counseling.

**¶31** We generally review discovery rulings for an abuse of discretion. *State v. Connor*, 215 Ariz. 553, 557, ¶ 6 (App. 2007). But to the extent a defendant asserts a constitutional claim that the information is critical to his defense, we review de novo. *Id.* We likewise review de novo evidentiary rulings that implicate the Confrontation Clause. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006).

**¶32** At the close of the fourth day of trial, defense counsel learned that the victim had been in counseling. That evening, defense counsel moved to compel the disclosure of the victim's counseling records. At a hearing on the motion, defense counsel argued that access to the records was necessary to determine whether the victim had wavered on her claim that Peterson was the perpetrator and also to establish whether the victim was taking any medications that might affect her memory. The court

denied the motion, finding that defense counsel had failed to provide "any kind of specific basis to believe that there's anything in those counseling records that would be relevant [and] exculpatory." The following day, while cross-examining the victim, defense counsel questioned her about counseling and the State objected. The court sustained the State's objection, noting at a bench conference that the victim received counseling only after she had revised her statements, and that counsel had not established a good-faith basis to believe that the line of questioning would reveal any exculpatory evidence.

¶33 Under the Victim's Bill of Rights, a victim may refuse "discovery request[s] by the defendant." Ariz. Const. art. 2, § 2.1(A); *see also State ex rel. Romley v. Superior Court*, 172 Ariz. 232, 239 (App. 1992). "[T]his right is not absolute, and in some cases a victim may be required to produce his or her medical records for *in camera* inspection by the trial court." *State v. Sarullo*, 219 Ariz. 431, 437, ¶ 20 (App. 2008); *Connor*, 215 Ariz. at 558, ¶ 11. But a defendant must first make a showing that either the physician–patient privilege has been waived or that the information sought is necessary to fully present his defense or cross-examine witnesses. *Connor*, 215 Ariz. at 558, ¶ 11; *see also Romley*, 172 Ariz. at 239 (explaining that the defendant's due process rights to a fair trial overcome the Victim's Bill of Rights and mandate disclosure when the court determines the victim's medical records are either exculpatory or essential to the presentation of the defense).

¶34 In this case, defense counsel argued that the counseling records "*may*" or "*could*" reveal that the victim's memory was affected by medication or that she was influenced to identify Peterson as the perpetrator of the sexual abuse. But there was no evidence that the victim had waivered after identifying Peterson as the perpetrator. And given that the victim identified Peterson as the perpetrator before beginning counseling, the superior court did not abuse its discretion by denying Peterson's request after finding that he had presented only speculation, rather than a "sufficiently specific basis," to believe there was information that was exculpatory or otherwise essential to his defense. *See Connor*, 215 Ariz. at 558, ¶ 11.

## IV. Admission of Nonverbal Out-of-Court Response.

¶35 Peterson argues the superior court erred by admitting evidence that Mother screamed when she saw that one of the mattresses had portions removed. Specifically, Peterson asserts this nonverbal conduct was "intended as an assertion" and therefore constituted inadmissible hearsay.

¶36        At trial, Detective Leske testified that Mother accompanied him as he searched her home. The prosecutor then asked what the detective observed with respect to Mother when he flipped over a mattress, revealing cut-out sections. Defense counsel objected, stating Mother's reaction, a scream, was a statement indicating surprise, the equivalent of saying "I didn't know that was there." The court overruled the objection, finding that "a reaction" such as a scream, laugh, or cry is not a statement, and thus "there can't be the truth within the statement being asserted." Detective Leske was then permitted to testify that Mother "screeched and began to cry" when she saw the mattress.

¶37        We review the superior court's evidentiary ruling for an abuse of discretion. *State v. Johnson*, 212 Ariz. 425, 433, ¶ 25 (2006). We will affirm the ruling if the result is legally correct for any reason. *Carlson*, 237 Ariz. at 387, ¶ 7.

¶38        An "oral assertion, written assertion, or nonverbal conduct" is a "statement" (and may be hearsay) if intended as an assertion. Ariz. R. Evid. 801(a). But "words or conduct not intended as assertions are not hearsay even when offered as evidence of the declarant's implicit belief of a fact." *State v. Chavez*, 225 Ariz. 442, 444, ¶ 8 (App. 2010). "When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an assertion is intended." Fed. R. Evid. 801 advisory committee's note to 1972 proposed rules subdivision (a). "The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved . . . in favor of admissibility." *Id.* And "[c]onduct can only be deemed an assertion if there is specific evidence or circumstances indicating the actor intended the conduct to be an assertion of the fact sought to be proved." *State v. Steinle*, 239 Ariz. 415, 420, ¶ 22 (App. 2016); *see also Ellison*, 213 Ariz. at 132, ¶ 56 (noting that "[m]ere speculation as to [the individual's] intent, without independent evidence," is insufficient to prove that nonverbal conduct was intended as an assertion).

¶39        In this case, nothing in the record suggests Mother's response was intended as an assertion. Peterson did not present independent evidence to support his claim that Mother intended to assert surprise by shrieking and crying, and the superior court did not abuse its discretion by allowing the detective's testimony regarding Mother's nonverbal response.

**CONCLUSION**

¶40       Peterson's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA