IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

THE STATE OF ARIZONA,      )
                           )      2 CA-CR 2008-0205
              Appellee,    )      DEPARTMENT B
                           )
       v.                  )      O P I N I O N
                           )
LOUIE THOMAS MACHADO,       )
                           )
              Appellant.   )
                           )

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. CR-20063933

Honorable Frank Dawley, Judge Pro Tempore

REVERSED AND REMANDED

Terry Goddard, Arizona Attorney General
  By Kent E. Cattani and David A. Sullivan                    Tucson
                                                Attorneys for Appellee


Robert J. Hirsh, Pima County Public Defender
  By M. Edith Cunningham                                      Tucson
                                               Attorneys for Appellant


E C K E R S T R O M, Presiding Judge.

¶1          Following a jury trial, appellant Louie Machado was acquitted of first-degree murder and convicted of the lesser included offense of second-degree murder. The trial court sentenced him to an aggravated prison term of eighteen years. On appeal, Machado argues the court denied him his constitutional right to present a defense by excluding third-party culpability evidence under Rule 403, Ariz. R. Evid., and the rules against hearsay. Because we conclude the trial court erred in excluding significant exculpatory evidence, we reverse Machado's conviction and remand his case for further proceedings consistent with this opinion. We find no error, however, in the court's exclusion of Machado's polygraph test results and the denial of his requested jury instruction regarding eyewitness identification.

## Background[1]

¶2          On October 25, 2000, sixteen-year-old Rebecca R. drove herself home from a pizza party hosted by the youth group of her church. Rebecca's mother was inside the house waiting for her daughter and talking on the telephone when she heard Rebecca pull up and close the door of her car. A neighbor reported hearing a brief argument outside in which Rebecca said she did not want to go with a man who had confronted her. Before

---

[1]This court generally sets forth and views on appeal the evidence presented below in the light most favorable to sustaining the conviction, *see State v. Davis*, 205 Ariz. 174, ¶ 2, 68 P.3d 127, 128 (App. 2002). Here, however, the primary issues raised on appeal challenge the preclusion of third-party culpability evidence under Rule 403, Ariz. R. Evid. We view such evidence "'in a light most favorable to its *proponent*, maximizing its probative value and minimizing its prejudicial effect.'" *State v. Castro*, 163 Ariz. 465, 473, 788 P.2d 1216, 1224 (App. 1989), *quoting United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983) (emphasis in *Castro*); *see also United States v. Denberg*, 212 F.3d 987, 993 (7th Cir. 2000) ("'[T]he general rule is that the [Rule 403] balance should be struck in favor of admission.'"), *quoting United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980).

Rebecca's mother could open the front door of the house, she heard a gunshot. Rebecca screamed and staggered toward her house, collapsing near the front porch. Her attacker ran away and fled the scene in a small, light-colored pickup truck.

¶3        Police originally suspected a classmate of Rebecca's, Jonathan H., of committing the murder. Jonathan was the boyfriend of Rebecca's best friend, Laura. However, investigators later shifted their focus to Machado. In addition to knowing Rebecca from school, Machado had dated Rebecca's cousin and had been friends with one of Rebecca's neighbors. The case remained unsolved for several years. In 2006 investigators from a newly formed "cold case" unit reopened the investigation, and a grand jury charged Machado with first-degree murder.

¶4        The state contended that Rebecca's father owed a drug debt to Machado's father, and Machado shot her accidentally in an effort to collect that debt. The state's only direct evidence supporting this particular theory was statements made by Machado's mother, Patricia, to police. She informed police that Machado had admitted these details when he told her he had killed Rebecca. Patricia also told police that Machado had told her he had killed Rebecca with an "old, antique gun," using bullets that could not be traced back to him. Although the murder weapon was never recovered, the bullet that killed Rebecca was a .32 caliber Smith & Wesson Long—a cartridge used in the early twentieth century but rarely used in modern firearms.

¶5        The state also presented evidence that Machado had confessed to killing Rebecca to his girlfriend over the telephone when he had been hospitalized. Other evidence established that his father owned a light-colored pickup truck. Earlier in the

3

investigation Machado had told police he had been with Rebecca when she was shot by another person. Machado told other people differing versions of this story, but he consistently said he had been with Rebecca when she was shot by someone else. However, those accounts were inconsistent with the physical evidence and witnesses' testimony about events on the night of the murder. Machado later retracted those statements and claimed he had never been present when Rebecca was killed. In 2006, after seeing Machado's picture on the news in connection with the murder, Rebecca's neighbor, who was also the father of Machado's friend in the neighborhood, informed police he had seen Machado walking down the street immediately after the shooting, Machado had recognized him, and Machado had said, "Hi."

¶6 Machado presented evidence at trial that Patricia had informed detectives she had fabricated Machado's alleged confession to "get even" with him for siding with his father during a contentious divorce and custody battle. Patricia's testimony at trial was consistent with that recantation. Machado's girlfriend testified she could neither hear Machado's telephonic statements to her clearly nor did she interpret his words at the time to be a confession that he had killed Rebecca. Machado also presented evidence that the witness who had identified him as being at the crime scene previously had told police he had not seen anyone leaving the scene on the night of the murder, and Machado presented expert testimony explaining how witnesses may create false memories over time.

¶7 To explain how Patricia's initial story about Machado's confession could have included accurate details about the incident, Machado presented evidence that some

4

of those details, including the old "western-style gun" used in the murder, were circulated previously by the detective investigating the case. Machado elicited that rumors and speculation about Rebecca's death were widespread, and Rebecca's mother had told police on the night of the killing that her ex-husband's drug use might somehow be behind it. Machado emphasized that no physical evidence connected him to the murder. He also elicited testimony that the truck seen leaving the murder scene had a camper shell, unlike the vehicle owned by his father.

¶8        Machado argued Jonathan was the person who had committed the crime. At trial, Machado presented evidence that Jonathan was upset with Rebecca for interfering with his relationship with his girlfriend and had threatened to kill Rebecca two weeks before her murder. Machado established that Jonathan had an "uncontrollable temper," was "very capable of violence," and had a restraining order issued against him to protect a former girlfriend. Although Jonathan had a date scheduled with Rebecca's best friend on the night of the murder, Jonathan did not show up for the date, and he gave inconsistent accounts of his whereabouts on that night.[2] In addition to this evidence, Machado presented photographs at trial identifying Jonathan and depicting him wearing somewhat baggy clothes—a similar style of clothing an eyewitness had described the shooter wearing.

---

[2]Jonathan initially told police he had been out with his friend Ryan at the movies and a Taco Bell; he told his girlfriend he had been out "drinking and getting high" with Ryan. He later told his girlfriend he had been in an Alcoholics Anonymous meeting and that she could confirm this with his mother. Jonathan had invited police to confirm his earlier story with his mother. Instead, Jonathan's father called police and said Jonathan had been home on the night of the shooting.

¶9 But, the trial court precluded Machado from presenting the following evidence:

(1) Within a month of the murder, Rebecca's family had received a telephone call from a person who sounded like a "well-spoken" young, white male. That person confessed to the shooting, said he knew the family but did not expect them to remember him, gave a reason for the killing consistent with the threats Jonathan previously had made to Rebecca, referred accurately to non-public details of the crime and funeral, and apologized for the murder, which he claimed had been accidental.[3]

(2) Police obtained a search warrant for Jonathan and listed the telephone call among the grounds that gave police probable cause to suspect him.

(3) In early 2000, after threatening to kill his girlfriend at that time (Kimberly) and her family, Jonathan pointed an "older looking . . . revolver" at Kimberly and her sister outside their house, told them to get into his car, drove them across town, and dropped them off, telling them to walk home.

(4) In 2005, Jonathan was convicted of assault for pointing a fake gun at his girlfriend (Deanna) and telling her he had killed before and would kill again.

(5) Jonathan had access to firearms, and Rebecca's best friend (Laura) had overheard a conversation between Jonathan and his friend, Ryan, during which they had discussed what guns they owned, and Ryan had said he had a ".32 something."

---

[3]Defense counsel proffered that Machado spoke with a "Sonoran Hispanic accent," that Jonathan was well-spoken, and that Jonathan had attended the funeral whereas Machado had not.

6

(6) Upon examining Jonathan's school notebook in November 2000, police found an entry he had written about the "perfect murder" for a school assignment.

(7) After Rebecca's death, Jonathan put her picture in his bedroom, referred to her as an "angel" and his "higher power," and attempted suicide.

(8) Jonathan repeatedly was physically violent toward women he had been involved with romantically over the years, and, within several years of Rebecca's murder, he put a knife to his girlfriend's throat (Nicol) after he had been drinking.

(9) In 2001, Jonathan was arrested and indicted on two counts of aggravated assault for a "road rage" incident in which he pointed a revolver at another driver and passenger.

¶10 The trial court also ruled inadmissible polygraph test results, parts of which suggested Machado did not shoot Rebecca. The court further ruled inadmissible statements Machado had made to police officers, including his comment that Rebecca had driven home in a "slug bug," when in fact she had driven home in a Ford Escort. The court denied Machado's specific jury instruction relating to the reliability of eyewitness identification, and the jury found him guilty of the lesser offense of second-degree murder. The court sentenced him to a partially aggravated term of eighteen years of imprisonment. Machado filed this appeal.

**Third-Party Culpability Evidence**

¶11 On appeal, Machado separately challenges the exclusion of evidence of Jonathan's other acts of violence and threats, his admission to killing in the past, his access to guns, his state of mind following the murder, the search warrant affidavit, and

7

the anonymous telephone call confessing to the murder. We address these rulings below, reviewing them for an abuse of discretion. *See State v. Davis*, 205 Ariz. 174, ¶ 23, 68 P.3d 127, 131 (App. 2002). First, however, we discuss the legal standards generally applicable to the admissibility of third-party culpability evidence.

¶12 "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), *quoting California v. Trombetta*, 467 U.S. 479, 485 (1984). This right is secured by the Confrontation Clause of the Sixth Amendment, *Davis v. Alaska*, 415 U.S. 308, 315 (1974), the Compulsory Process Clause of the Sixth Amendment, *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Washington v. Texas*, 388 U.S. 14, 18-19 (1967), the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3, 302 (1973); *State v. Oliver*, 158 Ariz. 22, 30, 760 P.2d 1071, 1079 (1988), and article II, §§ 4 and 24 of the Arizona Constitution. As the United States Supreme Court has observed, "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers*, 410 U.S. at 302.

¶13 Although the exercise of a defendant's right to present a defense generally must comply with those established rules of evidence "designed to assure both fairness and reliability in the ascertainment of guilt and innocence," such rules "may not be applied mechanistically to defeat the ends of justice." *Id.* In *Chambers*, for example, the defendant sought to present testimony that a third party repeatedly had confessed to the crime. *Id.* at 289. Acknowledging that no hearsay exception under Mississippi law expressly authorized the admission of such out-of-court statements, the Court held that

8

the trial court nonetheless had erred in precluding the evidence. *Id*. at 302-03. Specifically, it found the defendant's constitutional right to present a defense trumped the state rule when the proffered statements had all the circumstantial hallmarks of reliability underlying traditional exceptions to the general rule precluding hearsay. *Id.* at 300-02. In conformity with *Chambers*, our supreme court affirmed the preclusion of a co-defendant's exculpatory confession as inadmissible hearsay only after finding, pursuant to the corroboration requirement of Rule 804(b)(3), Ariz. R. Evid., that no reasonable person could conclude, based on corroborating and contradictory evidence, that the statements could be true. *State v. LaGrand*, 153 Ariz. 21, 26, 28-29, 734 P.2d 563, 568, 570-71 (1987). These cases stand for the proposition that, when assessing the admissibility of evidence proffered by an accused, the Sixth Amendment requires that courts be guided not only by the express terms of the pertinent rules of evidence, but, in applying those express terms, by the core principles of relevance and reliability that underlie them.

¶14 The Arizona Supreme Court has directed trial courts to assess the admissibility of third-party culpability evidence, such as that proffered here, under Rules 401, 402, and 403, Ariz. R. Evid. *See State v. Prion*, 203 Ariz. 157, ¶¶ 21-22, 52 P.3d 189, 193 (2002); *State v. Gibson*, 202 Ariz. 321, ¶ 19, 44 P.3d 1001, 1004 (2002). Under those rules, the proffered evidence must clear only two hurdles to be admissible: it must be relevant, meaning it must tend to create reasonable doubt as to the defendant's guilt, *Gibson*, 202 Ariz. 321, ¶¶ 13, 15, 44 P.3d at 1003, and, in accordance with Rule 403, the probative value of the evidence must not be substantially outweighed by the risk that it

9

will cause undue prejudice, confusion of the issues, or delay. *Gibson*, 202 Ariz. 321, ¶ 13, 44 P.3d at 1003.

¶15 Here, the trial court precluded Machado from presenting evidence establishing each of the elements of his third-party culpability defense, as itemized above, on the ground that "the danger of unfair prejudice and confusion substantially outweigh[ed] the[ir] purported probative value."[4] In conformity with the constitutional standards we have identified above, we are duty-bound to closely examine whether the court's exclusion of evidence on this basis conforms to the core principles expressed by Rule 403, and the Arizona Rules of Evidence as a whole. *See Chambers*, 410 U.S. at 295 (requiring "competing interest" expressed in state evidentiary rule be "closely examined" when conflicting with defendant's fundamental constitutional right to present defense through cross-examination). In light of these principles, we first examine the court's finding that introduction of the evidence would be unfairly prejudicial. Evidence may be considered unfairly prejudicial if has an "'undue tendency to suggest decision on an improper basis' such as emotion, sympathy or horror." *State v. Schurz*, 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993), *quoting* Fed. R. Evid. 403, Advisory Committee Note.

¶16 There is very little in the record reflecting the basis for the trial court's determination that the excluded third-party culpability evidence was unduly prejudicial. Both the written order and the relevant transcript from the hearing on the evidentiary ruling are silent on this issue. And although the state strenuously objected to the

---

[4]The trial court precluded the evidence of the anonymous telephonic confession on the additional ground that it was inadmissible hearsay, a separate issue we address below.

presentation of such evidence on the grounds that it was speculative and would lead to jury confusion, it does not appear from the record before us that the state ever sought to preclude the evidence on the ground that it would be unfairly prejudicial, nor did the state articulate what aspects of the evidence would have a prejudicial effect.[5]

¶17　　Consequently, we must determine independently how the introduction of the proffered evidence could have been regarded as unduly prejudicial to the state. As a threshold matter, we observe that evidence of a third party's culpability, such as the evidence proffered here, is neither relevant nor subject to analysis under Rule 403, unless it tends to create a reasonable doubt that the defendant committed the offense. *See Gibson*, 202 Ariz. at 323, ¶ 15, 44 P.3d at 1003. And, because it is the state's duty to "seek justice, not merely a conviction," *State v. Hughes*, 193 Ariz. 72, ¶ 33, 969 P.2d 1184, 1192 (1998); *accord State v. Rodriguez*, 192 Ariz. 58, ¶ 33, 961 P.2d 1006, 1012 (1998), the probative features of such evidence cannot themselves be unduly prejudicial to the state.[6]

---

[5]We discuss prejudice here as a separate concept from the risk of confusion. We do so because the trial court identified the two factors separately as outweighing the probative value of the proffered evidence, suggesting it had given each separate weight. Additionally, Rule 403 itself lists these factors as separate considerations. Moreover, we must search the record for any basis to affirm the trial court's ruling. *See State v. Childress*, 222 Ariz. 334, ¶ 9, 214 P.3d 422, 426 (App. 2009).

[6]The state has not argued the prejudicial effect of the evidence as to Jonathan could have been a ground for precluding the evidence under Rule 403. Although we need not address this issue, even assuming *arguendo* the prejudicial effect of the evidence as to a third party could be a basis for precluding the evidence, the threshold legal standards for the presentation of third-party culpability evidence sufficiently protect third parties from having their reputations unfairly sullied. Notably, *Gibson* rejected the "inherent tendency" standard for assessing third-party evidence precisely because it improperly

**¶18**        Presumably, much of the precluded evidence, including the evidence of Jonathan's repeated acts of violence toward and intimidation of his girlfriends, their friends, and others, would put Jonathan in a bad light and cause jurors to have an adverse emotional reaction to Jonathan.  But such evidence only becomes unduly prejudicial for purposes of Rule 403 if that kind of emotional reaction would distract the jury from fairly assessing the state's case.  *See Schurz*, 176 Ariz. at 52, 859 P.2d at 162 (adversely probative other-act evidence does not become prejudicial under Rule 403 merely because it portrays defendant in bad light). In the context of a case involving the murder of a teenage girl, we think it unlikely that a jury would be distracted and moved to emotion merely by evidence that a potential suspect in the murder had made violent threats to others.

**¶19**        Moreover, as the state acknowledges on appeal, the trial court admitted the "reputation" testimony of three of Jonathan's former girlfriends about his violent temper and aggressive nature.  Thus, any conceivable prejudicial effect Jonathan's misbehavior toward his girlfriends might have had on the state's case would have been cumulative. And, "the danger of unfair prejudice" would not be an appropriate basis for excluding probative evidence unless it "substantially outweigh[s]" the probative value.  Ariz. R. Evid. 403.  Given the wholly unarticulated and less than compelling nature of any such

---

focused attention on the third party's guilt or innocence.  202 Ariz. 321, ¶¶ 15-16, 44 P.3d at 1003-04.  And, a trial court may exclude evidence offering "only a possible ground of suspicion against another," *Prion*, 203 Ariz. 157, ¶ 21, 52 P.3d at 193, or "mere suspicion or speculation regarding a class of persons." *State v. Dann*, 205 Ariz. 557, ¶ 36, 74 P.3d 231, 243 (2003).

danger here, the probative value of the evidence in question would have to be comparatively trivial to justify preclusion on this basis.

¶20 We next address the trial court's preclusion of the third-party culpability evidence on the ground that its "danger of . . . confusion" substantially outweighed its probative value. The rationale behind this ground for excluding evidence is that

> "in attempting to dispute or explain away the evidence thus offered . . . the multiplicity of minor issues will be such that the jury will lose sight of the main issue, and the whole evidence will be only a mass of confused data from which it will be difficult to extract the kernel of controversy."

*Gibson*, 202 Ariz. 321, ¶ 17, 44 P.3d at 1004, *quoting* 1 Joseph M. Livermore et al., *Arizona Law of Evidence* § 403 at 86 (4th ed. 2000).

¶21 Here, although the state squarely raised this concern about the third-party culpability evidence Machado had proffered, the trial court did not articulate what particular features of the excluded items it believed would create the risk of confusion. We recognize that most of the precluded evidence relating to Jonathan involved separate incidents, and each incident would have required a separate evidentiary presentation. But Rule 403 authorizes the preclusion of evidence on this ground only when presentation of the evidence and any response thereto risks "confus[ing] . . . the *issues.*" *Id.* (emphasis added). All the precluded evidence here was directed at only one highly relevant issue: whether Jonathan, rather than Machado, murdered Rebecca. Moreover, any risk of confusion could be mitigated during opening and closing arguments, which counsel generally use to direct the jury's attention to the relevant features of the evidence, by the ability of the trial court to limit the presentation and rebuttal of evidence on collateral

13

issues, and by the jury's receipt of instructions and verdict forms immediately before deliberations. *See State v. Kuhs*, 223 Ariz. 376, ¶ 55, 224 P.3d 192, 203 (2010) (presuming jurors follow court's instructions).

**¶22** Finally, in fulfilling our duty under *Chambers* to apply Rule 403 in conformity with the underlying purposes of our rules of evidence, we cannot overlook that a jury can also be confused in its deliberations by the preclusion of relevant evidence. *See* Ariz. R. Evid. 102 ("These rules shall be construed . . . to the end that the truth may be ascertained and proceedings justly determined."); *see also State v. Castro*, 163 Ariz. 465, 473, 788 P.2d 1216, 1224 (App. 1989) (noting preference of rules of evidence for presentation of relevant evidence and, in context of Rule 403, concluding evidence proffered for accused must be evaluated in light most favorable to proponent, maximizing probative value and minimizing prejudicial effect). Here, in the absence of the precluded evidence, the jury readily could have dismissed the evidence against Jonathan as the empty threats of an unbalanced teenager.[7] And, although we separately analyze the probative value of the individual items of evidence later in this decision, it is likely the jury would have found more clarity than confusion in the precluded evidence suggesting Jonathan:  (1) had access to and used older looking guns; (2) arguably had confessed to Rebecca's family; (3) had accosted and kidnapped other girls at gunpoint from outside their home several months before the killing; (4) after Rebecca's death had threatened a woman at gunpoint and asserted he had killed before; and (5) had remained fixated with

---

[7]Indeed, during closing argument the state took this very approach, minimizing Jonathan's threats to Rebecca as nothing more than the angry statements of a teenager during a heated telephone call.

14

Rebecca long after her death, although he had not had a substantial relationship with her before her death.

¶23 Our supreme court's holding in *Prion* supports this analysis. In that homicide case, the trial court had precluded similar third-party culpability evidence involving a third party's prior acts of violence toward other women. Specifically, the court precluded evidence that a third party who worked with the victim had sexually harassed female co-workers, attempted to rape one co-worker, and bitten a woman's nose during a fight. 203 Ariz. 157, ¶¶ 23, 26, 52 P.3d at 193, 194. This evidence of prior acts committed by the third party in *Prion* also involved separate incidents that required independent proof. And, the evidence carried the risk that the jury might develop some emotional hostility toward the third party. Nevertheless, the court permitted the defendant to introduce the evidence, observing that although "some confusion could occur with the admission of the . . . evidence [of the third party's prior acts], its probative value is clear, and it is not substantially outweighed by the possibility of prejudice." *Id.* ¶ 26.

¶24 In sum, we cannot find compelling risks of prejudice or jury confusion existed here, based on the record before us. Nor can we meaningfully distinguish the nature of the third-party culpability evidence precluded here from the evidence our supreme court found admissible in *Prion*. Therefore, we conclude the trial court erred by precluding those items of evidence that carried substantial probative value on the grounds of prejudice and jury confusion. We now assess the probative value of each item of proffered but precluded evidence.

15

Items of Evidence Involving Jonathan's Violence and Threats Toward Others

¶25      Machado proffered evidence that in 2000, the same year Rebecca was murdered but before the murder had occurred, Jonathan kidnapped his girlfriend, Kimberly, and her sister at gunpoint outside their house by pointing an "older looking . . . revolver" at them. This evidence, if the jury believed it, had considerable probative value for several reasons. First, it suggested Jonathan had possessed a gun consistent in age with the unique antique type of cartridge used to kill Rebecca. Second, the similarity of the kidnapping to the murder is striking both in location and potential motivation. Jonathan had kidnapped Kimberly at gunpoint outside of her house; Rebecca was shot outside of her house weeks after Jonathan had threatened her in a matter related to his girlfriend. Indeed, the evidence suggests Rebecca was shot because she refused to comply with her assailant's efforts to kidnap her: one neighbor testified that she overheard Rebecca saying that "she didn't want to go" with her assailant just before she was shot. Finally, this evidence would have rebutted the state's suggestion during closing argument that Jonathan's threats had been those of a harmless teenager. Because this evidence has considerable probative value in support of Machado's defense and, as discussed above, was not outweighed by any substantial risk of confusion or prejudice, the trial court abused its discretion in precluding it.[8]

---

[8]Late in the trial, the court explained that it had precluded all the other-act evidence in part because most of the evidence about Jonathan's violence had been perpetrated against his girlfriends, and Rebecca was not his girlfriend. But, the 2000 gunpoint abduction of Kimberly at her doorstep also included the abduction of Kimberly's sister. Moreover, the probative value of the other-act evidence we find erroneously precluded is not found exclusively in the similarity of the offenses to the

16

¶26 In 2005, Jonathan was convicted of assault for pointing a gun at Deanna in his truck, threatening to kill her with it, and telling her he had killed before. This threat and admission occurred several years after Rebecca's death. Given that Machado also presented evidence that Jonathan had threatened to kill Rebecca two weeks before her death, a jury reasonably might have inferred that Jonathan's later assertion he had "killed before" referred to Rebecca. At minimum, our record contains no other evidence Jonathan had killed any of the several other persons he had threatened. This evidence therefore had considerable probative value and, for the reasons set forth above, the trial court erred in precluding it.

¶27 In 2001, Jonathan was arrested and charged with two counts of aggravated assault for a "road rage" incident in which he had pointed a revolver at another driver and passenger. When detectives investigated the incident, Jonathan's father maintained that he owned a revolver and might have left the gun in the car. Evidence about this incident, which occurred within a year of Rebecca's death, suggested Jonathan had access to his father's gun collection which allegedly included antique firearms. Given the unusual nature of the cartridge used to kill Rebecca, this was relevant evidence. The trial court erred in precluding evidence about the incident.

¶28 Finally, Machado sought to present evidence of several other incidents, reported by a succession of Jonathan's girlfriends, that Jonathan had been threatening, violent, and abusive within several years of the murder. One of the incidents involved

circumstances of Rebecca's death but rather, as discussed, in other evidentiary features of those incidents.

Jonathan holding a knife to a girlfriend's throat after he had been drinking. This kind of evidence, if believed by the jury, would have demonstrated that Jonathan was predictably violent toward his girlfriends—an arguably relevant fact given that Jonathan's death threats toward Rebecca had arisen out of his belief that Rebecca had disrupted one of those relationships. But evidence that Jonathan's romantic relationships triggered him to commit violent acts would have been cumulative to the incidents he allegedly had committed in 2000 and 2005; both of those incidents involved threats to girlfriends at gunpoint. Because we have already found evidence of the assaults committed in 2000 and 2005 admissible, we conclude these other incidents would have had little additional probative value. Consequently, the trial court did not err in precluding evidence about these incidents.

**¶29** The state maintains we should affirm the trial court's preclusion of all the other-act evidence on the additional ground the evidence would not have been admissible under Rule 404(b), Ariz. R. Evid.[9] Arizona law is unsettled on whether the admissibility of evidence of other acts, when offered by an accused to suggest a third party's culpability, should be evaluated under Rule 404(b) standards.

**¶30** In *State v. Tankersley*, 191 Ariz. 359, ¶¶ 39, 43, 956 P.2d 486, 496, 497 (1998), our supreme court affirmed the trial court's preclusion of third-party other-act evidence, based in part on Rule 404(b). But it did so in the context of assessing whether such evidence had "the inherent tendency" to connect the third party with the crime. *Id.*

---

[9]Although the trial court did not mention Rule 404(b) as a ground for precluding the evidence, we may affirm a trial court's ruling on any basis. *See Childress*, 222 Ariz. 334, ¶ 9, 214 P.3d at 426.

¶ 38. Several years later, the court ultimately rejected the inherent-tendency test for determining the admissibility of third-party culpability evidence, *Gibson*, 202 Ariz. 321, ¶ 19, 44 P.3d at 1004, holding that "Rules 401, 402 and 403, Arizona Rules of Evidence, set forth the proper test for determining the admissibility of third-party culpability evidence." And in *Prion*, the court expressly found the trial court had erred in precluding third-party evidence, the core of which involved three prior acts of the third-party suspect. *Prion*, 203 Ariz. 157, ¶¶ 23, 26, 52 P.3d at 193, 194. In so doing, the court confined its analysis to the standards set forth in *Gibson* and made no mention of Rule 404(b). *Prion*, 203 Ariz. 157, ¶¶ 19-26, 52 P.3d at 193-94.

¶31 The supreme court's reasoning in *Gibson* suggests it intended to establish a comprehensive test for determining admissibility of third-party culpability evidence, a test that neither referred to Rule 404(b) nor to that rule's standards. And in *Prion* the court did not apply Rule 404(b) in determining the admissibility of third-party other-act evidence. We therefore question the continuing vitality of *Tankersley*, to the extent it holds such evidence may be precluded based on application of Rule 404(b). *See State v. Blakely*, 204 Ariz. 429, ¶ 67, 65 P.3d 77, 90 (2003) (declining to address whether Rule 404(c) applied to someone other than defendant and reiterating that standard for determining admissibility of third-party evidence "is . . . set forth in Arizona Rules of Evidence 401, 402, and 403"). *But see State v. Fish*, 222 Ariz. 109, ¶ 42, 213 P.3d 258, 272 (App. 2009) (citing *Tankersley* and stating Rule 404(b) "applies to prior acts of alleged victims or third parties").

19

¶32 Although Arizona law is unsettled, it is the prevailing view in most federal and state courts that when evidence of other acts committed by a third party is proffered by an accused, that evidence does not fall under the exclusionary provisions of Rule 404(b). *See Sessoms v. State*, 744 A.2d 9, 16-18 (Md. 2000) (collecting cases from various federal and state courts). These courts generally observe that the core purpose of Rule 404(b), which is to prevent the risk that the jury will either assume the defendant's guilt from his prior misdeed or convict because the defendant has not been punished for his prior act, does not apply when an accused proffers evidence regarding the other acts of a third party in his or her defense and the other acts do not involve the misdeeds of the defendant. *See Sessoms*, 744 A.2d at 16-18 (identifying reasoning of collected decisions). We agree with the reasoning found in these cases.[10]

¶33 During oral argument, the state argued that subjecting its evidence to the limitations set forth in Rule 404(b), without placing the same limitation on defendants, would provide defendants an unfair advantage. But the inapplicability of the policy concerns underlying Rule 404(b) to the other acts of third parties does not mean that such evidence is categorically admissible when offered by an accused. The standards set forth in *Gibson* must still be met: the evidence must be sufficiently relevant that it "tend[s] to

---

[10]We acknowledge that in other contexts, a defendant's presentation of other-act evidence has been limited by statute or rule. *See, e.g.*, A.R.S. § 13-1421 (relating to evidence of victim's prior sexual conduct); Ariz. R. Evid. 404(a)(2), 405 (relating to character evidence of victim); *see also Fish*, 222 Ariz. 109, ¶¶ 35, 36, 213 P.3d at 270 (holding other-act evidence inadmissible to show victim was first aggressor or defendant's state of mind when defendant did not know of victim's prior acts). We confine our analysis here to evidence that tends to suggest a third party's guilt of the charged offense.

create a reasonable doubt as to the defendant's guilt," and its probative value must outweigh the risk the evidence will prejudice the state or confuse the jury. 202 Ariz. 321, ¶¶ 15-17, 44 P.3d at 1003-04 (emphasis omitted). We recognize that the state, just as the defendant, is entitled to a fair trial. But we think the *Gibson* standards sufficiently protect the state from a defendant's improper use of other-act evidence.[11]

¶34 Assuming *arguendo* the admissibility of third-party other-act evidence here should be analyzed under Rule 404(b), it would not alter our conclusions as to the admissibility of the three incidents we have found erroneously precluded. As stated above, each of those acts was offered for relevant purposes other than to show Jonathan's general character or propensity for committing violent crimes against women. *See Tankersley*, 191 Ariz. 359, ¶ 39, 956 P.2d at 496 ("Rule 404(b) creates an exception to the ban on character evidence when 'other crimes, wrongs, or acts' are offered for a relevant purpose other than propensity.").

Telephone Confession and School Assignment

¶35 In November 2000, almost a month after the murder, Rebecca's mother received an anonymous telephone call while staying at her father's home. Rebecca's aunt was also present and listened in on the conversation. The caller sounded like a young

---

[11]If a defendant offers other-act evidence merely to show the bad character or criminal propensities of another person, such evidence properly would be excluded by Rule 401, 402, or 403 either because it did not have a tendency to demonstrate the defendant's innocence or because it raised an unfounded suspicion against another person or class of people. *See Dann*, 205 Ariz. 557, ¶¶ 35-36, 74 P.3d at 243. As one scholar has explained, a defendant is not entitled "to throw strands of speculation on the wall and see if any of them will stick." David McCord, *"But Perry Mason Made It Look So Easy!": The Admissibility of Evidence Offered by a Criminal Defendant to Suggest that Someone Else is Guilty*, 63 Tenn. L. Rev. 917, 984 (1996).

white male who was "cold, cocky and well spoken." He said he knew the family through Rebecca but that they probably would not remember him. Apparently alluding to the funeral service, the caller said the pastor was wrong and Rebecca's murder was not God's will. The caller said he did not mean to kill Rebecca but he had been mad at her because she and her friend would not do what he had wanted. He said the police were wrong in thinking the killing was a random act of violence. The caller stated he had been waiting by a neighbor's house near a white minivan when Rebecca pulled into her front yard in her white Ford Escort. Police later traced the telephone call to a local pay telephone.

¶36        The details of the crime described by the caller were accurate. Rebecca's mother testified at trial that shortly before her daughter arrived home she had heard their dog barking on the west side of the house and had yelled at it to be quiet. A neighbor's white minivan was parked outside that night to the west of Rebecca's home. And, as the caller stated, Rebecca had driven a white Ford Escort home on the night she was killed. The investigating detective testified at a pretrial hearing that these details were not reported in the news. Consequently, he characterized the telephone call as a "good lead in the case" and testified there was "every reason to believe that the caller was in fact the shooter."

¶37        Some features of the call suggested it may have been made by Jonathan. He had attended Rebecca's funeral service, whereas Machado had not. Jonathan was Caucasian and well spoken, whereas Machado was Hispanic, spoke with an accent, and used incorrect grammar. Jonathan often used a pay telephone, even though he also had access to a cellular telephone and an ordinary telephone in his room. The mother of

22

Laura, Jonathan's girlfriend, described him as "a very cold and strange person," which was consistent with the description Rebecca's family provided of the caller's voice. And Jonathan had threatened to kill both Laura and Rebecca in a three-way telephone call approximately two weeks before the murder because they were trying to defuse tensions between Jonathan and Laura's ex-boyfriend, Norman: in short, Rebecca and Laura had not been "do[ing] what he wanted."

¶38 Not surprisingly, a police detective applied for, and obtained, a search warrant to collect evidence from Jonathan. The affidavit to secure the warrant listed the anonymous telephone call as the principal ground for suspecting Jonathan of being involved in the murder. Before Machado's trial, however, the state moved to preclude evidence of the telephone call on the grounds it would confuse the jury and Machado had not "satisfie[d] [his] burden" for admitting it. Machado argued below the telephone call was "an admission of guilt" and was sufficiently reliable under the circumstances to show Jonathan had made the call and Machado had not committed the murder. The state countered that the confession was a "generic phone call" and that the caller had possessed only "generic information."

¶39 As noted, the trial court precluded the telephone call pursuant to Rule 403, citing a danger of "unfair prejudice and confusion." Clearly, however, evidence about the telephone call had obvious, substantial probative value. Although the identity of the caller certainly would be a jury question, Machado had presented sufficient non-

23

speculative grounds to believe Jonathan had made the call.[12]  And if the jury concluded Jonathan had been the caller, that fact was highly probative of his guilt—and therefore of Machado's innocence.[13]  Moreover, a reasonable jury could conclude that the details contained in the confession demonstrated that the call had been made by the actual killer, even if the caller was not Jonathan.  Given that other evidence suggested Machado was not the caller, the evidence about the call had substantial probative value, regardless of whether it had been made by Jonathan.  We therefore conclude the court erred to the extent it found the probative value outweighed by the risks of prejudice and confusion.[14]

¶40      The trial court also found that the call constituted inadmissible hearsay. Our supreme court has held the normal hearsay rules apply to third-party culpability evidence, and these rules do not violate a defendant's due process rights—as long as they are not applied mechanistically as in *Chambers*.  *See LaGrand*, 153 Ariz. at 29, 734 P.2d at 571; *see also State v. Hoskins*, 199 Ariz. 127, ¶ 64, 14 P.3d 997, 1015 (2000).  Rule 804(b)(3), Ariz. R. Evid., permits the introduction of certain out-of-court statements made against a declarant's interest.  Under the rule, a defendant may offer a hearsay statement in order to exonerate himself if (1) the declarant is unavailable, (2) the

---

[12]As we discuss in greater detail below, the state had been sufficiently persuaded Jonathan had made the telephone call that it sought and was given a warrant to obtain a voice exemplar from him.

[13]The trial court acknowledged the telephone confession was relevant and allowed that it might even be "super relevant."

[14]We are especially perplexed by how this particular evidence, which relates directly to potentially establishing the identity of Rebecca's killer, could distract the jury from the relevant issues in the case.  And, if the jury were to conclude Jonathan had made the call, we are equally at a loss as to how such evidence would unfairly prejudice the state.

statement tended to subject the declarant to criminal liability at the time the statement was made such "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and (3) "corroborating circumstances clearly indicate the trustworthiness of the statement." In determining the admissibility of a statement, a trial court must "examine any evidence that corroborates or contradicts the statement to find whether a reasonable person could conclude that the statement is true." *State v. Harrod*, 200 Ariz. 309, ¶ 16, 26 P.3d 492, 496 (2001), *vacated on other grounds*, 536 U.S. 953 (2002); *accord LaGrand*, 153 Ariz. at 28, 734 P.2d at 570.

¶41 Here, the declarant was unavailable because his identity was never definitively confirmed, and Jonathan had expressed an intention to invoke his right against self-incrimination if called as a witness.[15] And, although the declarant did not identify himself, the contents of his statements clearly tended to subject him to criminal liability insofar as the caller openly maintained he had shot Rebecca. The caller also knowingly exposed his voice and features about himself and his motivations that would create a risk that he could be identified from his call. Indeed, as discussed, the state intensified its investigation of Jonathan precisely because it believed he was the declarant based on certain features of the confession. In short, the anonymous declarant was not only aware that his confession tended to subject him to criminal liability—this is undoubtedly why he did not identify himself—but the statements actually had the

_____

[15]Although the trial court ruled Jonathan did not have a sufficient basis to assert this right regarding the circumstances of Rebecca's death, the court stated it would revisit its ruling if Jonathan were asked incriminating questions under oath. Machado did not call Jonathan as a witness.

25

ultimate effect of focusing law enforcement's efforts on the investigation of the presumed declarant.

**¶42** As discussed above, and as asserted by the state when seeking a warrant based on the telephone call, the contents of the confession corroborated its trustworthiness. The caller described accurate details about the killing that were not public knowledge.[16] Moreover, neither the fact that such a call had been made nor the contents of that call were disputed. Both the victim's mother and aunt had heard the conversation. Therefore, the policy behind the heightened standards for admitting exonerating hearsay—namely, avoiding fabrication—was inapplicable to this evidence. *See* Fed. R. Evid. 804(b)(3) Advisory Committee Note ("The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication."); *see also Chambers*, 410 U.S. at 302 (admitting evidence of third party's confession, notwithstanding contrary state evidentiary rule, because circumstances of confession suggested trustworthiness of statements and broader policy goals of evidentiary rules pursued by its admission).

---

[16]Machado observes the state implicitly deemed the confession trustworthy when it sought and obtained a warrant for Jonathan's physical characteristics based on that confession. Accordingly, Machado argues that statement was either admissible as non-hearsay pursuant to Rule 801(d)(2)(B), Ariz. R. Evid., or, in the alternative, that the state should have been judicially estopped from later challenging its trustworthiness in the hearsay context. *See State v. Towery*, 186 Ariz. 168, 182, 920 P.2d 290, 304 (1996) (successful party estopped from assuming inconsistent position in subsequent proceeding involving same parties and question). But we have concluded that the anonymous confession was admissible as a statement against penal interest pursuant to Rule 804(b)(3) and therefore need not address these arguments.

¶43 The trial court's comments suggest it questioned the reliability of the telephone call in that it "would be unfair to present [evidence of the call] without identification." But anonymous telephone calls are routinely admitted as evidence of guilt against parties when circumstantial evidence establishes the defendant had made the call. *E.g.*, *State v. Grube*, 883 P.2d 1069, 1076 (Idaho 1994); *State v. Croscup*, 604 S.W.2d 69, 71 (Tenn. Crim. App. 1980); *Bevers v. State*, 811 S.W.2d 657, 662-63 (Tex. Ct. App. 1991). And, our supreme court has instructed that, when determining the admissibility of third-party hearsay statements under Rule 804(b)(3), judges must be careful not to "bootstrap [themselves] into the jury box via evidentiary rules." *LaGrand*, 153 Ariz. at 28, 734 P.2d at 570. Once the anonymous confession satisfied the test for determining admissibility under Rule 804(b)(3), any continuing challenges to the statement's accuracy or the caller's identity, were for the jury to decide. *State v. Lopez*, 159 Ariz. 52, 55, 764 P.2d 1111, 1114 (1988)("In determining admissibility under Rule 804(b)(3) . . . the trial judge does not determine questions of credibility. That is a jury function.")

¶44 Based on the corroborating circumstances articulated above, reasonable jurors readily could have found the confession was true and that it had been made by Jonathan or, at minimum, not by Machado. *See LaGrand*, 153 Ariz. at 28-29, 734 P.2d at 570-71 (setting forth deferential test for admissibility of third-party confessions in conformity with *Chambers* requirement that rules not be applied "mechanistically"). Because the evidence therefore was admissible as a statement against penal interest under Rule 804(b)(3), the trial court erred in precluding it.

¶45    However, the trial court did not abuse its discretion when it precluded evidence about Jonathan's school assignment regarding the "perfect murder." In that assignment, Jonathan described the "perfect murder" as one that has been "plan[n]ed out" and "do[ne] at a random time when no one suspects you, . . . leav[ing] no trace that you were there," and carried out with "no remorse." Although this composition was facially relevant, given the circumstances of Rebecca's murder, the investigating detective testified at a pretrial hearing that the composition had been written as part of a school assignment about William Shakespeare's play *MacBeth*. The court therefore did not abuse its discretion in implicitly concluding that this evidence has trivial probative value once placed in context.

Weapons

¶46    The trial court precluded evidence about Jonathan's "general access to weapons" as well as the testimony of his former girlfriend, Laura, that she had heard Jonathan and Ryan talking about a .32 caliber firearm on the grounds the evidence created a risk of "unfair prejudice and confusion." As discussed above, we have concluded that, based on the record before us, the court's unspecified concerns about the risk of prejudice and confusion could not substantially outweigh evidence that carries substantial probative value. We therefore assess only whether the weapons evidence in question was substantially probative.

¶47    As Laura testified, Jonathan was upset with Laura's former boyfriend, Norman, for contacting her in the fall of 2000. Jonathan also was upset with Rebecca for trying to prevent a fight between him and Norman. During this time frame, Jonathan had

28

threatened to shoot Norman, Laura, and Rebecca. It was also during this period that Laura had heard Jonathan and Ryan talking about what guns they owned, and Ryan had stated he had a ".32 something" or ".30 something" caliber weapon. Given that Jonathan claimed to have been with Ryan on the night of Rebecca's murder, both Jonathan's potential access to a .32 caliber firearm—the murder weapon in this case—and his discussion about it with Ryan in the same time frame during which the threats had been made against Rebecca were probative. The trial court therefore abused its discretion in precluding this specific testimony. Because the evidence suggests Rebecca was shot with a unique cartridge from an antique .32 caliber firearm, we also conclude the court erred in precluding, pursuant to Rule 403, other evidence of Jonathan's access to unique weapons or his father's purported firearm collection, which allegedly included antique guns.

Other Character and State-of-Mind Evidence

¶48 The trial court precluded two types of evidence offered to show Jonathan's state of mind after the murder: (1) evidence of his drug and alcohol use and (2) evidence of his parents' concerns about his conduct or mental health. This evidence presumably was offered to show that Jonathan was unstable and therefore the type of person who might commit a shooting. This is character evidence providing only the most attenuated relevance to the facts of the case, and any such relevance would be cumulative to the testimony of Jonathan's girlfriends that he had a violent temperament and evidence that Jonathan had committed specific acts of gun violence toward others. The court did not abuse its discretion in generally precluding this minimally probative and wholly cumulative evidence under Rule 403.

¶49 Although we uphold the trial court's ruling in part, we find the court abused its discretion in precluding other evidence of Jonathan's state of mind after the murder. Evidence showing consciousness of guilt is relevant evidence. *E.g.*, *State v. Kemp*, 185 Ariz. 52, 59, 912 P.2d 1281, 1288 (1996); *State v. Ferguson*, 149 Ariz. 200, 210, 717 P.2d 879, 889 (1986); *see also Gibson*, 202 Ariz. 321, ¶¶ 3, 7, 19-20, 44 P.3d at 1002-03, 1004 (remanding for redetermination of whether evidence of third parties' nervousness and "severe mental health problems shortly after the murder" admissible under Rules 401, 402, and 403).

¶50 Here, the trial court precluded evidence of a letter Jonathan had sent to his girlfriend, Nicol. In that letter, Jonathan referred to Rebecca as his "higher power," expressed his desire to avenge Rebecca's death, and revealed that he had "put a Glock 17 to [his] head . . . [and] pulled the trigger," though he did not actually kill himself as he had intended. The court also precluded Nicol from testifying that Jonathan had talked about Rebecca frequently during the time he dated Nicol, between 2001 and 2003; he referred to Rebecca as his "angel"; and he had a framed photograph of Rebecca displayed in his room with a letter behind it.

¶51 The trial court explained its ruling as "a remoteness [Rule] 403 decision." Yet the fact that Jonathan exhibited a fixation with Rebecca that continued several years after Rebecca's death was precisely why the evidence was relevant and probative as to Jonathan's possible consciousness of guilt. Notably, Rebecca's relationship to Jonathan before her death was that of a disliked confidant of his then girlfriend. The jury might reasonably question why Jonathan's thoughts appeared so consumed with Rebecca's

30

death if indeed he played no role in it. This evidence had sufficient probative value to overcome any unarticulated risk that the jury might confuse the issues.

Police Evidence

¶52    The trial court precluded Machado from introducing the probable cause affidavit used to obtain a search warrant for Jonathan. The court also precluded all "other evidence related to police suspicions." As the state correctly observes, police officers' suspicions and investigative actions are typically inadmissible because they are neither probative of culpability nor evidence of a third party's guilt. *E.g.*, *Oliver*, 169 Ariz. at 591, 821 P.2d at 252. Such evidence is not categorically excluded, however, and if relevant for another purpose, it remains subject to the traditional Rule 401 and Rule 403 standards for admitting third-party evidence. *See Prion*, 203 Ariz. 157, ¶¶ 23, 26, 52 P.3d at 193-94 (suggesting evidence police considered third party a suspect and tested his car for presence of blood improperly precluded). Here, some features of the police investigation and the manner in which it was carried out were important to Machado's defense.

¶53    As Laura testified, Jonathan changed his alibi for the night of the murder "[s]hortly after he became a suspect,"[17] telling her he had been at an Alcoholics Anonymous meeting. Under the facts of the case, therefore, police suspicions were not offered merely as evidence of Jonathan's guilt; rather, they were offered for the relevant purpose of placing in context Jonathan's behavior after Rebecca's murder, including his

---

[17]The trial court sustained the state's objection to the portion of this testimony that suggested Jonathan had been a suspect.

inconsistent alibis. Furthermore, given that the trial court correctly allowed Machado to present evidence of Jonathan's inconsistent statements to his girlfriend and the police, the simple fact that officers had suspected Jonathan was implicit in those inquiries and already before the jury. Allowing the jury to also understand the timing of when Jonathan became a suspect would have eliminated unnecessary gaps in the story and allowed the jury to evaluate more fully Machado's defense.

¶54 The trial court did not err in denying Machado's request to admit all of the contents of the search warrant and its accompanying affidavit, as those items were essentially a compilation of hearsay statements and other facts assembled by the investigating detective. We have already evaluated those statements or facts and determined their admissibility on their own merits. How much weight the officers placed on those statements or facts was not relevant. When a defendant is "allowed to present all of his objective evidence of [a third party's] culpability," the "subjective" beliefs of police are properly excluded. *Oliver*, 169 Ariz. at 591, 821 P.2d at 252.

¶55 However, the trial court abused its discretion in precluding any references to the existence of the search warrant and affidavit and to their contents. These documents were relevant and probative of Machado's guilt to the extent necessary to establish the thoroughness and accuracy of the police investigation—issues germane to Machado's defense. *Cf. id.* (noting fact third party suspected and arrested not at issue in case). Based largely on the anonymous telephone call Rebecca's family received shortly after the murder, which we have discussed above, police obtained a search warrant to collect photographs, fingerprints, and a voice sample from Jonathan. However, police

later lost that voice recording, and Rebecca's mother and aunt never had the opportunity to confirm whether it was Jonathan's voice they had heard on the telephone. This was significant because Rebecca's mother had told investigators "she could recognize [the voice] if she heard it again." *See State v. Willits*, 96 Ariz. 184, 187, 191, 393 P.2d 274, 276, 279 (1964) (allowing jury to make inferences against state when state responsible for loss of potentially exculpatory evidence). The affidavit also established police had been informed Jonathan had threatened Kimberly and her sister with a gun. But, as the detective admitted at a pretrial hearing, he did not make a determination about whether the gun Jonathan had used was connected to Rebecca's homicide. Nor did the detective attempt to verify Jonathan's alibi with Jonathan's friend, Ryan, whom Jonathan claimed he was with on the night of the murder. The fact Jonathan was a suspect and had a search warrant issued against him was also a significant piece of contextual information that would have assisted the jury in evaluating the motivations of Jonathan's father when he told the police his son had been home around the time of the murder. Thus, although we agree that evidence of police officers' subjective beliefs were irrelevant and appropriately excluded, Machado was entitled to argue the state had failed to sufficiently investigate Rebecca's case to build a case of proof beyond a reasonable doubt against him. Evidence of the state's failure to seek potentially crucial information about Rebecca's death was therefore relevant and admissible.

¶56        In sum, the trial court correctly ruled that the contents of the search warrant affidavit were not globally admissible. But the court abused its discretion in precluding evidence about the investigation necessary to place the relevant acts of suspects into

33

context and to establish substantial oversights in the overall investigation of Rebecca's murder.[18]

## Machado's Statements

¶57 Machado further contends the trial court erred in precluding two statements he had made to police. In September 2001, he told police that Detective Benjamin Jimenez had told him the murder weapon was an old looking gun. Machado also stated that when he saw Rebecca before the murder, he thought she had driven up in a "slug bug," apparently meaning a Volkswagen Beetle. In fact, Rebecca was driving a white Ford Escort that night, which recently had been purchased. The court precluded this evidence on the ground that "the probative value is not great and . . . the dangers of confusion and prejudice outweigh the purported probative value." We review the court's rulings for an abuse of discretion. *See State v. Davis*, 205 Ariz. 174, ¶ 23, 68 P.3d 127, 131 (App. 2002).

¶58 First, we agree with the state that Machado's proffered statement about the gun was inadmissible hearsay. Rule 801(c), Ariz. R. Evid., defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing,

---

[18]Machado claims the trial court erroneously precluded evidence that "[i]n November 2000, while investigating the identity of the person who had anonymously called and confessed to [the] murder, Detective Jimenez learned from Nick C. . . . . that Jonathan had recently claimed to have shot someone." The trial court's ruling did not preclude Nick C. from testifying about Jonathan's admission to shooting someone, and Machado did not seek to elicit this information from Nick C. when he testified at trial. It is unclear from the record whether Nick C. had firsthand knowledge of the admission or if he simply had heard rumors about Jonathan and relayed these to Detective Jimenez. In any event, to the extent Machado sought to elicit this information from Detective Jimenez, the court did not err in precluding it as hearsay.

offered in evidence to prove the truth of the matter asserted." Such evidence is generally inadmissible under Rule 802, Ariz. R. Evid. Yet out-of-court statements may be offered to establish the knowledge or state of mind of the person who heard them, regardless of their truth. *Pub. Serv. Co. of Oklahoma v. Bleak*, 134 Ariz. 311, 320-21, 656 P.2d 600, 609-10 (1982); *Rutledge v. Ariz. Bd. of Regents*, 147 Ariz. 534, 545-46, 711 P.2d 1207, 1218-19 (App. 1985). As our supreme court explained, "words offered as evidence of an utterance which caused a state of mind in the listener are not within the proscription of [Rule] 802, since they are not offered for a hearsay purpose." *Bleak*, 134 Ariz. at 320, 656 P.2d at 609. Here, however, Machado sought to present two levels of hearsay—his own statement about what Jimenez had said. Thus, even if Jimenez's statement was offered for a non-hearsay purpose to show Machado's knowledge of the case, Machado's own statement recalling that conversation was self-serving hearsay for which there is no exception. *See State v. Barger*, 167 Ariz. 563, 566, 810 P.2d 191, 194 (App. 1990). The trial court did not err by precluding this evidence.

¶59        As to Machado's mistaken identification of the vehicle, we agree with the trial court that this statement was not hearsay. The statement was not offered for the truth of the matter asserted but to show Machado's knowledge (or lack thereof) of the actual incident. We also agree with the court's implicit conclusion that Machado's statement was relevant. Part of the state's case against Machado was based on the fact that Machado knew details about the crime. The accuracy of his knowledge about the crime scene therefore was relevant and probative.

¶60 The probative value of Machado's incorrect statement was even greater in light of the improperly precluded telephone call discussed above. The anonymous caller, who did not sound like Machado, had apologized for murdering Rebecca and correctly identified the car she had been driving. Contrary to the trial court's finding, the admission of Machado's "slug bug" statement would not have confused the issues or risked unfair prejudice. The trial court therefore abused its discretion in precluding the evidence under Rule 403.

## Polygraph Results

¶61 Machado next contends the trial court erred in ruling inadmissible the results of a polygraph test he had taken at the request of police in 2004. The examiner who administered the test determined no deception was indicated when Machado said he did not shoot Rebecca. Our supreme court has held that "all references to polygraph tests, absent stipulation, are inadmissible for any purpose in Arizona." *State v. Hoskins*, 199 Ariz. 127, ¶ 69, 14 P.3d 997, 1014 (2000); *accord State v. Rodriguez*, 186 Ariz. 240, 250, 921 P.2d 643, 653 (1996); *State v. Montes*, 136 Ariz. 491, 499, 667 P.2d 191, 199 (1983). The state refused to stipulate to the admission of the test results here, and the court properly ruled they were inadmissible.

## Jury Instruction

¶62 Last, Machado contends the trial court erred in denying his requested jury instruction regarding eyewitness identification. Machado sought the instruction based on the testimony of the neighborhood witness who, after hearing news of Machado's arrest years after the crime, reported seeing Machado at the murder scene. The proffered

36

instruction, which was based on *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), provided that the jury could not consider an in-court identification of the defendant unless the state proved beyond a reasonable doubt that it was reliable. The instruction further provided that the reliability of the identification was to be based on such factors as the witness's opportunity to view the person at the time of the crime, degree of attention, accuracy of descriptions prior to the pretrial identification, and the level of certainty at pretrial identification, as well as the passage of time between the crime and pretrial identification.

¶63 *Dessureault* specifies the procedures for admitting in-court identifications. *Id.* at 384, 453 P.2d at 955. Its requirements are sequential, "triggered only if and when a determination is made that a pretrial identification procedure was unduly suggestive." *State v. Leyvas*, 221 Ariz. 181, ¶ 13, 211 P.3d 1165, 1169 (App. 2009). Absent a finding that an identification was unduly suggestive, a court "need not . . . instruct that the jury must be satisfied beyond a reasonable doubt that pretrial identification was fair." *State v. Harris*, 23 Ariz. App. 358, 360, 533 P.2d 569, 571 (1975). Here, Machado did not request a *Dessureault* hearing or move to suppress the identification, and the trial court did not find the pretrial identification unduly suggestive. It therefore was not required to instruct the jury pursuant to *Dessureault*.

¶64 A trial court does not err by refusing to give a requested jury instruction when the court's instructions, as a whole, adequately set forth the applicable law. *State v. Musgrove*, 223 Ariz. 164, ¶ 6, 221 P.3d 43, 46 (App. 2009). Here, the trial court correctly instructed the jury on the state's burden to prove the defendant guilty beyond a

reasonable doubt.[19]  It also correctly informed the jury of its role to weigh the evidence presented at trial and determine the credibility of witnesses.  Moreover, the court permitted Machado to argue the various factors listed in the rejected instruction that might impact an eyewitness's reliability.  The court did not abuse its discretion in refusing to give the proffered instruction.

## Harmless Error

¶65        We last turn to whether the trial court's preclusion of numerous components of Machado's third-party culpability defense entitles Machado to a new trial. Because Machado properly presented all of his evidentiary arguments that he makes on appeal to the trial court in the first instance, we review for harmless error.  *See State v. Coghill*, 216 Ariz. 578, ¶ 28, 169 P.3d 942, 949 (App. 2007).  "Error . . . is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict."  *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993).  By this standard, we cannot conclude the error was harmless.

¶66        We have found that the trial court erroneously precluded considerable evidence that Jonathan murdered Rebecca: it precluded evidence that several months before Rebecca's shooting Jonathan similarly had kidnapped his girlfriend and her sister at gunpoint from their doorstep; that circumstantial evidence suggested Jonathan had confessed to Rebecca's mother; that Jonathan had admitted to having killed someone;

_____

[19]Although Machado challenges the reasonable doubt instruction given below, the instruction was given in accordance with *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), and did not constitute error.  *See Dann*, 220 Ariz. 351, ¶ 65, 207 P.3d at 618 (observing Arizona Supreme Court has "repeatedly rejected challenges to the *Portillo* instruction").

38

that Jonathan had access to antique guns and had wielded an older looking gun in a previous assault; and that Jonathan maintained a peculiar obsession with Rebecca after her death. These precluded facts, coupled with the evidence that Jonathan had threatened to kill Rebecca two weeks before the incident and had provided inconsistent alibis for the time of the shooting, might have caused a jury to conclude there was a reasonable possibility Jonathan had killed Rebecca and therefore a reasonable doubt about whether Machado had done so.[20] *See Prion*, 203 Ariz. 157, ¶ 27, 52 P.3d at 194 (finding preclusion of similar third-party culpability evidence reversible error under facts of case). We therefore cannot say that the error did not affect the verdict.

¶67        The state argues that any error in the preclusion of evidence as to Jonathan's culpability was harmless because the trial court did not preclude all such evidence. Specifically, the state maintained at oral argument that we should affirm Machado's conviction notwithstanding any error because Machado was allowed to present a *prima facie* third-party culpability defense. But the United States Constitution affords criminal defendants "'a meaningful opportunity to present a complete defense,'" not a partial one. *Holmes*, 547 U.S. at 324, *quoting Crane*, 476 U.S. at 690; *see also Chambers*, 410 U.S. at 291-93, 302-03 (granting new trial based on erroneous preclusion of third party's confessions notwithstanding trial court's admission of other substantial

---

[20]Notably, the jurors submitted written questions about whether Jonathan had access to guns, whether he had been violent to his girlfriends, and whether he had followed through on his threats. This suggests that the jury was seeking precisely the type of specific information the trial court precluded. Those requests were refused in conformity with the court's rulings precluding such evidence.

evidence third party had committed offense). And, as discussed above, we think the erroneously precluded evidence here was potentially pivotal.

## Disposition

¶68 For the foregoing reasons, we reverse Machado's conviction and remand the case for further proceedings consistent with this opinion.

/s/ *Peter J. Eckerstrom*
PETER J. ECKERSTROM, Presiding Judge

CONCURRING:

/s/ *J. William Brammer, Jr.*
J. WILLIAM BRAMMER, JR., Judge

/s/ *Garye L. Vásquez*
GARYE L. VÁSQUEZ, Judge