NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JERICE HUNTER, *Appellant*.

No. 1 CA-CR 15-0499
FILED 9-21-2017

Appeal from the Superior Court in Maricopa County
No. CR2012-008323-001
The Honorable Rosa Mroz, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Adele Ponce
*Counsel for Appellee*

De Brigida Law Offices, PLLC, Glendale
By Ronald M. De Brigida, Jr.
*Counsel for Appellant*

James E. Rogers College of Law Clinical Programs, Tucson
By Vanessa Buch
*Co-Counsel for Amicus Curiae Innocence Project Inc.*

William Farr & Gallagher, New York, NY
By James C. Dugan, Pro Hac Vice
*Co-Counsel for Amicus Curiae Innocence Project Inc.*

Arizona Attorneys for Criminal Justice, Tucson
By David J. Euchner
*Co-Counsel for Amicus Curiae Arizona Attorneys for Criminal Justice*

Law Office of Julia Cassels, Tempe
By Julia B. Cassels
*Co-Counsel for Amicus Curiae Arizona Attorneys for Criminal Justice*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Jennifer B. Campbell joined.

---

**H O W E**, Judge:

¶1          Jerice Hunter appeals her convictions and sentences for child abuse and first-degree murder. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2          At 5:21 p.m. on October 11, 2011, Hunter called 9-1-1 to report the disappearance of her five-year-old daughter, the victim. Within minutes, a nearby patrol officer arrived at Hunter's apartment complex and encountered an upset and "teary" Hunter standing out front. Hunter explained that she ran an errand at approximately 4:10 p.m. and left the victim and her other young children in the charge of her then 13-year-old daughter, T.H. By the time Hunter returned home less than an hour later, the victim was missing.

¶3          Over the next several hours, numerous officers responded to the report of a missing child. Initially, the officers canvassed the apartment complex, knocking door-to-door. They then contacted all residences within a one-mile radius by telephone, uploaded the victim's information onto a

national missing child database, contacted the press, requested an air unit to assist with a search, and investigated several possible victim sightings. Despite these efforts, the officers were unable to locate the victim.

¶4            On October 14, 2011, Child Protective Services ("CPS")[1] took Hunter's other children into State custody. A few weeks later, T.H.'s foster mother provided the police with a letter that T.H. had written to her grandmother. Based on the contents of the letter, a detective interviewed T.H. on November 18, 2011. Following that interview, officers executed a search warrant on Hunter's apartment and discovered "pour patterns" inside her bedroom closet consistent with "someone [having] wiped the wall with chemicals." Officers then seized the closet's carpet.

¶5            Five days later, Hunter's neighbor, S.A., contacted a police detective. She reported that she drove Hunter to an apartment complex across town on October 4, 2011, because Hunter had ostensibly wanted to sell some clothes to a friend. When they arrived at the apartment complex, Hunter unloaded a large duffel bag that she had placed in S.A.'s trunk. To S.A.'s surprise, Hunter then put on plastic gloves and placed the bag inside a dumpster, explaining that her friend would later retrieve it.

¶6            After speaking with S.A., the detective had the dumpster from the apartment complex impounded. Later that day, two members of Maricopa County's Canine Search and Rescue Unit, each of whom worked with a certified cadaver dog trained to find decaying human remains, reported to the police station to perform checks on various items. Both dogs alerted on S.A.'s trunk, the carpet seized from Hunter's bedroom closet, and the dumpster impounded from the apartment complex. The State subsequently charged Hunter with one count of child abuse and one count of first-degree felony murder of her five-year-old daughter. The State also alleged five aggravating circumstances against Hunter. The State also alleged that Hunter had four historical prior felony convictions.

¶7            At Hunter's 2015 trial, several of Hunter's cousins testified that she had relocated to California shortly after giving birth to the victim and had left the victim in the care of relatives. Four and one-half years later, Hunter returned to Arizona and demanded custody of the victim, though she had no housing and was living at a shelter. Hunter's cousins initially

---

[1]      In 2014, the Arizona Legislature eliminated CPS and in its place created the Department of Child Safety. *See* S.B. 1001, 51st Leg., 2d Spec. Sess., ch. 1, § 20 (2014). To maintain consistency with the trial court record, we will refer to the parties as they existed at the time.

refused to relinquish custody of the victim, and did so only after Hunter called the police. When the cousins subsequently saw the victim at family gatherings, they became concerned that she was being physically abused and notified CPS.

¶8 The victim's kindergarten teacher testified that Hunter called her on September 21, 2011, and inquired whether the victim was bothering classmates or failing to complete her work in class. The teacher assured Hunter that the victim was well-behaved and hard-working at school, but Hunter complained that the victim was defiant, aggressive, and uncooperative at home. The attendance clerk from the victim's school testified that the victim last attended class on the next day, September 22, 2011. When the clerk spoke with Hunter regarding the victim's absences, Hunter reported that the victim had ringworm and pinkeye and would be kept home until she recovered.

¶9 The custodian of records at a pediatric clinic testified that the victim was a registered patient, but that none of the clinic's health care providers ever treated her. Hunter had scheduled appointments for both the victim and one of her sisters on October 11, 2011. But on the day of the appointments, Hunter called the clinic to cancel or reschedule only the victim's sister's appointment. Neither Hunter nor the victim appeared for the victim's appointment, however, and the clinic logged the victim's appointment as a "no-show."

¶10 The victim's oldest sibling, T.H., testified that in the weeks leading up to the victim's disappearance, Hunter had repeatedly become angry with the victim and "spanked" her out of the other children's view. After the last "spanking" incident, the victim never emerged from Hunter's bedroom. During the days that followed, T.H. snuck into Hunter's bedroom to check on the victim while Hunter was out of the apartment. She noticed that the victim had bruises "everywhere," clumps of missing hair, and dark matter oozing from her eyes. On the first visit, T.H. offered the victim food and water and helped her to the bathroom, because the victim was unable to walk independently. By the third and final visit, the victim was barely moving and no longer talking. The last time T.H. saw the victim was approximately a week before Hunter reported her missing. T.H. explained that Hunter initially instructed the children to tell anyone who inquired that the victim was home sick, and on October 11, 2011, she ordered the children to report that the victim was missing.

¶11 One of Hunter's neighbors testified that the last time she saw the victim was in September 2011, when the victim returned home from

school with other children who rode the bus. She explained that after she informed the police that she had not seen the victim with the other school children for weeks, Hunter told her she was "the devil."

¶12     A woman who met Hunter while they were both living at a shelter testified that she stayed at Hunter's apartment for several days in April 2011 and saw Hunter behave very "aggressively" with the victim. Most notably, Hunter "whipp[ed]" the victim because she dropped some playdough on the floor. When the woman attempted to intercede, upset by the severity of the punishment inflicted on the victim, Hunter warned her not to interfere. Reluctant to intervene any further, the woman immediately left the apartment, leaving behind all her belongings, including two large duffel bags.

¶13     One of Hunter's cousins testified that he had visited Hunter at approximately 7:30 a.m. on October 4, 2011. During his brief visit, he noted that her apartment smelled strongly of bleach. When he left, Hunter asked him to drop off her daughter, whom he had never met, at a school bus stop. Although Hunter introduced the young girl as the victim, the cousin later saw the victim's photograph on the news and immediately realized that she was not the little girl whom he had driven to the bus stop.

¶14     Several criminalists testified about tests they had conducted on the carpet seized from Hunter's bedroom, the lining of S.A.'s trunk, and the dumpster impounded from the apartment complex. A stain of the victim's blood, measuring approximately 11 inches in length and 8 inches in width, was found on the closet carpet. A small blood stain was also found on S.A.'s trunk liner, but the blood was neither the victim's nor any of her relatives'. Police found no blood or other trace evidence inside the dumpster.

¶15     A police detective testified that investigators obtained footage from the transfer station that handled the trash collected from the seized dumpster on October 4, 2011. The video showed that a full, dark "canvas-style bag" was picked up that day. Based on the footage, investigators searched the receiving landfill for 96 days, but were unable to locate the bag or the victim's body.

¶16     After the State rested and the trial court denied Mother's motion for judgment of acquittal, Hunter called two witnesses who told police that they saw a child resembling the victim the day of her reported disappearance. The first witness, V.Y., acknowledged that he "probably" reported seeing the victim on October 11, 2011, but testified that he could

not be sure which of Hunter's daughters he saw that day. The second witness, C.G., confirmed that she saw a little girl who looked like the victim that afternoon.

¶17	After a 24-day trial, the jury found Hunter guilty of both counts. The jury also found four aggravating circumstances. The trial court found that Hunter had four historical prior felony convictions and sentenced her to an aggravated term of 20 years' imprisonment on the count of child abuse and a term of natural life on the count of first-degree felony murder. Hunter timely appealed.

## DISCUSSION

### 1. Denial of Motion for Judgment of Acquittal

¶18	Hunter contends that the trial court improperly denied her motion for judgment of acquittal.[2] Given the State's failure to recover the victim's body and its substantial reliance on circumstantial evidence, she argues that no reasonable jury could have found her guilty. We review de novo a trial court's ruling on a motion for judgment of acquittal. *State v. West*, 226 Ariz. 559, 562–63 ¶¶ 15, 19 (2011). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 562–63 ¶¶ 16, 19. Sufficient evidence upon which a reasonable jury can convict may be direct or circumstantial. *Id.* A judgment of acquittal is appropriate only when no substantial evidence supports the conviction. Ariz. R. Crim. P. 20(a).

¶19	As relevant here, a person commits child abuse by intentionally or knowingly (1) causing a child to suffer a physical injury or (2) placing a child in a situation in which the child's health is endangered,

---

2	The Innocence Project, Wrongful Conviction Clinic at the University of Arizona James E. Rogers College of Law and Arizona Attorneys for Criminal Justice have filed amici curiae briefs with this Court. We have denied the State's motion to strike the briefs of amici curiae. However, we consider only the portions of those briefs that comply with Arizona Rule of Criminal Procedure 31.25, and address only the arguments that the parties have raised. *See* Ariz. R. Civ. App. P. 16(a) ("Amicus curiae is not a party to the appeal, and must be independent of any party to the appeal."); *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 4 n.2 ¶ 7 (2013) (holding that amici curiae are not permitted to create, extend, or enlarge issues beyond those raised by the parties).

if the circumstances are likely to produce death or serious physical injury. A.R.S. § 13–3623(A)(1). Pursuant to A.R.S. § 13–1105(A)(2), a person commits first-degree felony murder by committing child abuse, and in the course of that offense, causing the death of any person.

¶20 Here, the State presented evidence that Hunter severely injured the victim then confined her to a bedroom closet without food, water, or medical care. T.H. testified that Hunter had physically disciplined the victim outside the other children's view, and that the victim had never emerged from Hunter's bedroom thereafter. When T.H. surreptitiously checked on the victim after Hunter left the apartment, she saw that the victim's small body was bruised "everywhere," clumps of her hair were missing, and her eyes were oozing a dark substance. T.H. helped the victim to the bathroom because she could not walk unassisted, then returned her to the confines of Hunter's closet. Within days of sustaining the injuries at the hand of her mother, the victim could no longer speak and could barely move. T.H. never saw her again. Investigators who later examined Hunter's closet found the carpet stained with the victim's blood and found pour patterns suggesting that the closet walls had been cleaned with chemicals.

¶21 In addition, the State presented evidence that Hunter had disposed of the victim's body. S.A. testified that Hunter had asked for a ride to a friend's apartment under the pretense of selling clothes, but that instead, Hunter had placed a large duffel bag purportedly containing the clothing inside a dumpster, offering the nonsensical explanation that her friend would later retrieve it. Investigators obtained video of the trash from the dumpster and confirmed that a large duffel bag was picked up on the day in question.

¶22 Given these facts, sufficient evidence exists from which a reasonable jury could find that Hunter intentionally and knowingly physically injured the victim and then placed her in a situation endangering her health, namely, confining her to a closet without medical treatment, food, and water. A reasonable jury could further find that the conditions of the victim's confinement ultimately resulted in her death. Therefore, the trial court did not err by denying Hunter's motion for judgment of acquittal.[3]

---

[3] Contrary to her argument, no expert medical opinion testimony was necessary to prove that Hunter's failure to treat the victim's injuries endangered the victim's health. The record reflects that the victim could no

## 2. Alleged Preclusion of Third-Party Culpability Evidence

**¶23** Hunter asserts that the trial court's evidentiary rulings prevented her from fully presenting her defense that "someone else was responsible for her daughter's disappearance." Specifically, she contends that the court improperly excluded evidence identifying a member of her extended family who allegedly threatened a defense witness.

**¶24** During a mid-trial hearing, the court questioned whether defense counsel had intended to argue that one of Hunter's relatives abducted the victim. Referencing prospective defense witness C.G., defense counsel explained that she would present evidence that the victim had been abducted, but disclaimed any intent to identify the perpetrator as a family member or any other particular person.

**¶25** Later at trial, while cross-examining a detective who spoke with C.G. the evening of the reported disappearance, defense counsel elicited testimony that C.G. had provided police with information regarding a suspect car. Defense counsel then questioned whether C.G. subsequently reported to police that she had been threatened. The prosecutor objected to the question on grounds of relevance and argued that any evidence regarding the identity of the person who had allegedly threatened C.G. was inadmissible hearsay because "somebody else told [C.G.] the person was [F.T.]" In response, defense counsel argued that the detective's failure to follow-up on C.G.'s reported threat demonstrated that the police did not investigate other leads in the case. The trial court implicitly overruled the objection and allowed defense counsel to question whether the detective conducted any investigation into C.G.'s reported threat. After the detective acknowledged that C.G. had provided the name of the person who had allegedly threatened her, defense counsel asked whether the detective had addressed C.G.'s claim when he spoke with F.T. The detective admitted that he had never discussed C.G.'s allegation with F.T., though he spoke to F.T. after C.G. reported the threat.

---

longer speak or move by the time that T.H. had last visited her, demonstrating that the victim's health was seriously compromised and her life in jeopardy. Likewise, notwithstanding Hunter's claims, the State did not need to prove that the victim lost a fatal quantity of blood while confined in the closet. To prove child abuse and felony murder pursuant to A.R.S. §§ 13–3623(A)(1) and –1105(A)(2), the State had to show only that the victim was seriously injured and then confined to a closet for several days without food, water, or medical care.

¶26 Before defense counsel later called C.G. to testify, the court revisited the State's claim that any evidence regarding the identity of the woman who had allegedly threatened C.G. was irrelevant and inadmissible hearsay. Defense counsel reasserted that the evidence was relevant to demonstrate that the police "did not look at anyone but" Hunter. The court noted that defense counsel had already elicited testimony from the detective to support the argument that the police did not investigate the report and had failed to explore all leads in the case. After hearing from the parties, the court determined that any evidence regarding the identity of the person who threatened C.G. was irrelevant. In response to the court's ruling, defense counsel agreed that the name of the individual was not relevant and expressly disclaimed any intent to argue that F.T. abducted the victim. The court then instructed defense counsel that she could elicit the nature of the "threat," but not the name of the individual who allegedly made the threat.

¶27 C.G. then testified that she was outside her apartment the afternoon of October 11, 2011, and saw a young, crying girl who appeared to be by herself. When C.G. offered to help the girl return home, she ran away. As the girl ran down the street, a dark car approached her. Quite suddenly, a door swung open and a black woman emerged, grabbed the girl's arm, and pulled her into the car. The events unfolded in a matter of seconds, and given the child's failure to scream or otherwise resist, C.G. was uncertain whether she had witnessed an abduction. As soon as she heard the victim was reported missing, however, C.G. approached officers canvassing the neighborhood and relayed what she had witnessed. A few days later, a black woman, unknown to C.G., banged on C.G.'s apartment door. When C.G. answered the door, the woman addressed C.G. in a "threatening" voice and "demanded" that C.G. revise her story and "tell the police that it was a white woman that took the child, not a black woman." Though frightened, C.G. told the woman that she knew what she saw and would not lie. After the woman left, C.G. contacted the police, reported that she had been threatened, and named the individual who had threatened her. When asked by both defense counsel and the prosecutor how she had provided the name of the unfamiliar woman, C.G. explained that her neighbor "knew the family" and identified the woman to her.

¶28 During closing arguments, defense counsel told the jury that the police had failed to conduct a thorough investigation of all leads in the case:

> Even when [C.G.] said that she was being threatened, that
> seemed odd and strange and something that needs to be

looked into. It was absolutely ignored. [C.G.] called the detectives. Told them she had been threatened. She gave the name of the person that had threatened her. She said that it didn't matter what they said to her. She was not going to change what she saw because she knows she saw what she saw. Nobody is going to make her change her mind. She gave the name and the detectives told you they did nothing with it.

They did talk to [F.T.] four months later, but they never talked to her about threatening [C.G.]. They never talked to her about [C.G.] at all.

¶29　　　　At that point, the prosecutor objected, and the trial court ordered that the portion of defense counsel's argument pertaining to F.T. be stricken. The court then instructed defense counsel to "rephrase," and defense counsel argued:

Let's be clear, you know from [C.G.'s] testimony that she gave information to [the detective] about being threatened. It scared her. It bothered her. She didn't like it. She needed someone to know. She needed the detectives to know. And she told [the detective], and she gave him a name. And you heard from [the detective] that later when he talked to [F.T.], he never brought up [C.G.'s] name. He never asked her anything about [C.G.]. Never tried to verify to make any connection. It was ignored, and that's the point. It's all about the information, that officers felt didn't fit into their theory that [Hunter] is guilty, so they're going to ignore it.

It really does beg the question, though, why anyone would be threatening [C.G.] if she didn't see [the victim] that way. If she saw some other little girl, why in the world would anyone need to threaten her?

On rebuttal, the prosecutor responded to defense counsel's argument by reminding the jury that F.T. was "the defendant's beloved father's girlfriend," not "somebody associated elsewhere."

¶30　　　　We generally review a trial court's ruling on the admissibility of third-party culpability evidence for an abuse of discretion. *State v. Prion*, 203 Ariz. 157, 161 ¶ 21 (2002). But because Hunter did not seek to introduce the name of the woman who threatened C.G. as evidence of third-party culpability at trial, and twice disclaimed any intent to do so, we review this

claim for only fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19 (2005).

¶31        The normal restrictions on hearsay apply to third-party culpability evidence. *State v. Machado*, 224 Ariz. 343, 358 ¶ 40 (App. 2010), *abrogated on other grounds as recognized in State v. Nottingham*, 231 Ariz. 21, 26 n.4 ¶ 13 (App. 2012). In general, an out-of-court statement offered to prove the truth of the matter asserted is inadmissible. Ariz. R. Evid. 801(c), 802.

¶32        Here, Hunter sought to prove the identity of the woman who allegedly threatened C.G. through C.G.'s out-of-court statements to police and in-court testimony. Because C.G. did not know the woman and could provide the woman's name only by recounting her neighbor's identifying statement, the evidence was plainly hearsay. *See* Ariz. R. Evid. 801(c). Therefore, the trial court did not err, much less fundamentally err, by excluding the evidence. *See State v. Carlson*, 237 Ariz. 381, 387 ¶ 7 (2015) ("We will affirm the trial court's ruling if the result was legally correct for any reason.").

¶33        Moreover, even if the trial court improperly precluded the evidence, Hunter sustained no prejudice. The record reflects that Hunter had an unhindered opportunity to present evidence that C.G. saw a black woman pull a young girl who resembled the victim into a car. This evidence allowed Hunter to argue that someone else caused the victim's disappearance. In addition, Hunter elicited testimony that: (1) a woman had threatened C.G. and had demanded that she alter her statement to police and (2) police officers had failed to investigate the reported threat. This evidence permitted Hunter to argue that the police investigation focused solely on her, to the exclusion of other possible leads.

¶34        To the extent that the identity of the woman who had allegedly threatened C.G. was possibly relevant, the record reflects that defense counsel had repeatedly placed the information before the jury. First, when questioning the detective who had interviewed C.G., defense counsel asked whether he had spoken with F.T. regarding C.G.'s claim that she had been intimidated. Second, defense counsel asserted during closing argument that the detective had failed to "make the connection" between F.T. and the threat when he subsequently questioned F.T. If any doubt regarding the identity of the woman persisted, the State removed it by adopting defense counsel's framing of the issue and arguing that, unlike other family members, F.T. was not at odds with Hunter and therefore that any suggestion that she may be culpable was misleading. Thus, Hunter

identified the woman who allegedly threatened C.G., albeit indirectly. Because she was therefore able to fully present her defense that someone else caused the victim's disappearance and that the police failed to adequately investigate that lead, Hunter sustained no prejudice from the trial court's ruling preventing her from directly eliciting the name of the woman who allegedly threatened C.G.

### 3. Admission of Cadaver Dog Evidence

¶35     Hunter contends that the trial court improperly admitted "dog sniff" evidence. She argues that the court abdicated its gatekeeping function by failing to apply *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Arizona Rule of Evidence ("Rule") 702. She also challenges the court's findings that the evidence was reliable and relevant and that its probative value outweighed any danger of unfair prejudice.

¶36     Before trial, Hunter moved to preclude any cadaver dog evidence pursuant to *Daubert* and Rules 401, 402, 403, and 702. At an evidentiary hearing held on the motion, D.H. testified that his pure-bred Golden Retriever, Casey, became a certified cadaver dog in November 2006 and recertified annually through 2012. As a cadaver dog, Casey was trained to detect decaying human biological material. To train Casey, D.H. used teeth, knee bone, blood, and placenta from living persons, as well as "grave dirt from a soak site." Throughout his testimony, D.H. reiterated that all decaying human tissue produces "the enzymes" that a cadaver dog is trained to detect, and that a cadaver dog therefore does not distinguish between material separated from a living person and the remains of a deceased one.

¶37     In November 2011, D.H. and Casey assisted the police with the identification of cadaver material related to this case. When D.H. and Casey reported to an open yard at the police station, Casey immediately walked to the corner of the yard and alerted on an "air handling system" connected to an evidence room that may have contained "cadaver material." D.H. then redirected Casey to two cars, one a decoy car and the other a subject car. The trunk lid of each car was held slightly ajar, and Casey alerted on the subject car, which was S.A.'s car. D.H. then led Casey to a loading dock where a decoy dumpster and a subject dumpster were located. Initially, Casey alerted on some unrelated biohazard containers holding human biological material, but D.H. then redirected her and she alerted on the subject dumpster, which was impounded from the apartment complex where Hunter deposited the canvas bag. Finally, D.H. and Casey entered the police station and Casey sniffed two decoy carpets and a subject

carpet. Casey alerted on the subject carpet, which was seized from Hunter's closet. D.H. admitted that he had never previously tested whether Casey could detect the scent of cadaver material when the decaying matter had been removed more than a month before and stated that he did not know how long a scent could remain inside an enclosed container. He also acknowledged that he had assisted in setting up the car and carpet tests, and was therefore aware which items were suspect.

¶38        B.S. testified that her pure-bred Labrador Retriever, Brogan, became a certified cadaver dog in 2007 and recertified annually since that time. Like Casey, Brogan initially alerted on the air unit in the police yard and the biohazard containers by the loading dock, but he then alerted on the subject trunk, dumpster, and carpet. B.S. also testified that Brogan cannot distinguish between decaying material that has been separated from a living person and the remains of a deceased one. Akin to D.H., B.S. further testified that she has never tested how long a cadaver scent can be detected after decaying material has been removed. Unlike D.H., B.S. had no knowledge which car, carpet, or dumpster were suspect during the tests.

¶39        After D.H. and B.S. testified, defense counsel argued that the cadaver dog evidence was irrelevant because the dogs, admittedly, could not distinguish between the decaying matter of a living person and a deceased individual. Accordingly, the dogs would have alerted on the carpet and trunk liner, which contained blood stains, whether a deceased person was ever present. Because ascertaining what human biological material, if any, may have been deposited in the dumpster between October 4, 2011, and its seizure on November 23, 2011, was impossible, defense counsel argued that no basis existed to conclude that the dogs alerted on the scent of a deceased person with respect to any of the items.

¶40        After taking the matter under advisement, the trial court entered a detailed ruling denying Hunter's motion. The court found that the canine handlers' testimonies did not constitute "scientific testimony" for *Daubert* purposes because the handlers were "not testifying about any scientific technique, theory or methodology." Instead, they were discussing "an investigative technique," sharing "their personal observations," and explaining "their interpretation" of the dogs' actions "based on their training and experience." Nonetheless, the court analyzed the canine handlers proffered testimony "within the framework of Evidence Rule 702" and found:

1.  [D.H.] and [B.S] have specialized knowledge that will help the jury understand the evidence. Their testimonies regarding the human remains searches are relevant.

2.  Casey is a pure bred Golden Retriever, a breed of dogs known for tracking scent. Casey has been trained and has been certified and re-certified in tracking decaying human remains scents. Casey has been certified since 2005 until she retired in 2013. Casey did not fail a recertification until 2013. The Court finds that Casey's training and certification programs are adequate.

3.  Brogan is a pure bred Labrador Retriever. Brogan has been trained and has been certified and re-certified in tracking decaying human remains scents. Brogan has been certified since 2007, and he has never failed a re-certification. The Court finds that Brogan's training and certification programs are adequate.

4.  Casey alerted on the trunk area of the vehicle at issue, rather than the decoy vehicle. Casey also alerted on the dumpster at issue, rather than the decoy dumpster. She also alerted on carpeting from the apartment rather than the decoy carpeting. Independent of Casey, Brogan also alerted on the trunk area of the vehicle at issue, rather than the decoy vehicle, the dumpster at issue, rather than the alternate dumpster, and the carpeting from the apartment rather than the decoy carpeting.

5.  Based on their training and experience, and the fact that Brogan was able to verify Casey's results and vice versa in this case, the Court finds that there are sufficient reasons to trust Brogan and Casey's alerts, and the results are sufficiently reliable.

6.  The dogs are trained and certified to detect the scent of decaying human remains. The dogs are not trained or certified to: (1) differentiate whether the decaying human remains scent is from bone or blood or other types of tissues; (2) differentiate whether the decaying scent was from a live person's biological material or a dead person's biological material; and (3) determine how long the scent can linger in an area with the scent. However, these factors do not affect the reliability of the dogs' performances. The Court finds that these factors go towards the weight of the evidence, not its admissibility.

7. The Court finds that the probative value of [D.H.] and [B.S]'s testimonies regarding the human remains searches is not substantially outweighed by a danger of unfair prejudice.

**¶41**        We review a trial court's admission of expert testimony for an abuse of discretion. *State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 13 (2014). In doing so, we view "the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *State v. Ortiz*, 238 Ariz. 329, 333 ¶ 5 (App. 2015).

**¶42**        The admissibility of expert testimony is governed by Rule 702, which was amended in 2012 to reflect "the principles set forth in *Daubert*." *State ex. Rel. Montgomery v. Miller*, 234 Ariz. 289, 297 ¶ 17 (App. 2014). The rule allows a witness who is qualified as an expert by knowledge, skill, experience, training, or education to testify in the form of an opinion or otherwise if such testimony "will help the trier of fact to understand the evidence or determine a fact in issue[.]" Ariz. R. Evid. 702(a).

**¶43**        In evaluating whether expert opinion will assist the trier of fact, the trial court serves as a gatekeeper, "with the aim of ensuring such testimony is reliable and helpful[.]" *State v. Romero*, 239 Ariz. 6, 9 ¶ 12 (2016) (quoting Ariz. R. Evid. 702 cmt. (2012)). Notwithstanding the trial court's gatekeeping role, the rule does not "supplant traditional jury determinations of credibility and the weight to be afforded otherwise admissible testimony," nor is it intended to "preclude the testimony of experience-based experts." Ariz. R. Evid. 702 cmt. (2012); *see also Sandretto v. Payson Healthcare Mgmt., Inc.*, 234 Ariz. 351, 357 ¶ 14 (App. 2014) (citing the advisory committee note to Federal Rule 702: "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge skill, training, or education—may not provide a sufficient foundation for expert testimony."). Accordingly, "[c]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Ariz. R. Evid. 702 cmt. (2012). Finally, when Rule 702 is implicated, the proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *State v. Bernstein*, 237 Ariz. 226, 229 ¶ 9 (2015).

**¶44**        Contrary to Hunter's argument, the record reflects that the trial court fulfilled its gatekeeping role. Although the court found that the "dog sniff" evidence was not a testable scientific technique under *Daubert*, it nonetheless properly applied Rule 702, which embodies the *Daubert*

principles and concluded that the evidence satisfied the threshold standards for relevance and reliability.

¶45        The record supports the trial court's findings. At the evidentiary hearing, D.H. and B.S. testified regarding their and their dogs' training to obtain certification as canine-handler teams. D.H. and B.S. also testified regarding their previous experience working with the police to locate cadaver material, described their search methods, discussed their techniques for directing their canines, and explained how they interpret their dogs' behaviors. In addition, the State presented evidence that both canine-handler teams passed the applicable training and certification programs and maintained their certifications through the relevant time periods. Moreover, specific to this case, both dogs independently alerted on the suspect items—not the decoy items—demonstrating their ability to distinguish between cadaver material and other scents. As the trial court found, the dogs essentially verified each other's findings, and their consistent results, along with the evidence regarding the dogs and their corresponding handlers' training and experience, satisfied Rule 702's reliability threshold.

¶46        Nonetheless, Hunter correctly notes that neither canine (1) had typically used line-ups in actual, non-training searches, (2) had ever demonstrated an ability to detect cadaver material at a location/on an item more than fifty days after the cadaver material had been removed, and (3) could distinguish between decaying human material deposited from a living person and that from a deceased individual. As the trial court found, however, these limitations on the canines' training and abilities affected the weight afforded to the "dog sniff" evidence, not its admissibility. *See State v. Delgado*, 232 Ariz. 182, 186 ¶ 12 (App. 2013) ("If an expert meets the liberal minimum qualifications, her level of expertise goes to credibility and weight, not admissibility."); *see also* Ariz. R. Evid. 702 cmt. (explaining that the amendment did not disturb "traditional jury determinations of credibility and the weight to be afforded" testimony).

¶47        Similarly, the jury could consider limitations in D.H.'s testimony in deciding the dog sniff evidence's weight—but those limitations did not themselves bar the evidence's admissibility. *See id.*; *see also Bernstein*, 237 Ariz. at 230 ¶ 18 (explaining that "in close cases, the trial court should" admit expert testimony and "allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the weight and credibility of evidence"). These limitations included (1) that the locations for the car and dumpster test sites were contaminated with scents from unrelated decaying human biological material, (2) D.H.'s knowledge

that some items were suspect and the corresponding possibility that he may have intentionally or unwittingly led his canine to alert on those items, and (3) D.H.'s contradictory trial testimony that his dog never made a false alert.

¶48 Hunter also argues that the dog sniff evidence was inadmissible under Rules 401 and 403. Specifically, she argues that the dog sniff evidence relating to the trunk liner and carpet was irrelevant because the dogs would have alerted to the mere presence of blood on those items, and therefore their alerts did not demonstrate that a dead body had ever been present. She also argues that the experts'[4] use of the word "cadaver" was "misleading and unduly prejudicial."

¶49 Relevant evidence is admissible unless it is otherwise precluded by the federal or state constitution, an applicable statute, or rule. Ariz. R. Evid. 402. Evidence is relevant if it has "any tendency" to make a fact of consequence in determining the action "more or less probable than it would be without the evidence." Ariz. R. Evid. 401. But even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ariz. R. Evid. 403.

¶50 Applying these principles here, evidence that both canines alerted on the suspect carpet, trunk liner, and dumpster tended to prove that the deceased victim had been present in those spaces. That is, the evidence rendered the State's theory that Hunter had killed the victim in her bedroom, transported the victim's body in S.A.'s trunk, and disposed of the victim's body in an apartment dumpster more probable than it would have been without the evidence. Although Hunter correctly notes this evidence did not prove the victim was deceased, and the canines' alerts can be otherwise explained, the evidence did provide some proof. With respect to Hunter's claim of unfair prejudice through the experts' use of the term "cadaver" at trial, the record reflects that both canine-handlers repeatedly explained that their use of the term "cadaver" referred to any decaying human biological material, whether its source was alive or dead. Therefore, although the term may otherwise refer to a dead body, the undisputed evidence at trial clarified the meaning of the term with respect to "cadaver dogs." Because the term's meaning was clear, its use did not suggest the jury should decide the case on an improper basis, and was therefore not unfairly prejudicial. *See State v. Mott*, 187 Ariz. 536, 545 (1997) ("Unfair prejudice results if the evidence has an undue tendency to suggest decision

---

[4] Although Hunter refers to the "State's" use of the term "cadaver," she raises this claim as part of her challenge to the admission of the "dog sniff" evidence, and we therefore review the argument within that context.

on an improper basis, such as emotion, sympathy or horror."). Accordingly, the trial court did not abuse its discretion by admitting D.H. and B.S.'s expert opinion testimony.

## CONCLUSION

**¶51** For the foregoing reasons, we affirm Hunter's convictions and sentences.

